[Civ. No. 10988. Fourth Dist., Div. Two. Jan. 13, 1972.]

COUNTY OF RIVERSIDE, Plaintiff and Respondent, v.
MAMIE L. WHITLOCK et al., Defendants and Appellants;
GROSS AND COMPANY, INC., Defendant and Respondent.

864

**COUNSEL**

Macomber & Eley and William B. Eley for Defendants and Appellants.

Ganahl & Ganahl and John T. Ganahl for Plaintiff and Respondent.

F. Mackenzie Brown for Defendant and Respondent.

**OPINION**

**TAMURA, J.**—The primary issue posed by this appeal is whether the majority protest schemes provided by the Municipal Improvement Act of 1913[1] and the Special Assessment Investigation, Limitation and Majority Protest Act of 1931[2] are subject to the "one-person, one-vote" equal protection standard governing distribution of the elective franchise.

The following is a brief background of the events leading to this appeal:

Upon receipt of a petition by landowners in the Meade Valley area of Riverside County requesting institution of proceedings under the Improvement Act of 1913 for the construction of a gas distribution system for domestic service to the area,[3] the board of supervisors employed a firm of civil engineers to serve as engineer of work and undertook the requisite proceedings under the principal act and the Majority Protest Act. The resolution of intention proposed, inter alia, the construction of the improve-

---

[1]Division 12, Streets and Highways Code, hereinafter referred to as Improvement Act of 1913.

[2]Division 4, Streets and Highways Code, hereinafter referred to as the Majority Protest Act.

[3]The character of the area in which the improvements are to be constructed is described by the county surveyor in his preliminary report to the board of supervisors as follows: "The lines will offer service to an existing 588 homes, 94 trailers, and 8 churches, or a total of 690. An additional 40 homes and 9 trailers are scattered in the district and not situated on the proposed mains."

ments in the streets and rights of way therein described, the assessment of the costs and expenses of the work upon the lands within the proposed district, the issuance of serial bonds under the Improvement Act of 1911,[4] and the performance of the work by the Southern California Gas Company with title to vest in the utility upon completion of the work.

Upon the filing of the engineer's reports under the principal act and the Majority Protest Act, the board set a date for concurrent hearings on three matters, protests under the principal act, protests to the investigation report filed pursuant to the Majority Protest Act, and a hearing on the public character of the streets in which the distribution lines were to be constructed. Owners of 8.6 percent of the area of the lands proposed to be assessed made written or oral protest. Following the hearings, the board adopted a resolution pursuant to the provisions of the Majority Protest Act finding that the proposed project was feasible, that the lands to be assessed will be able to carry the burdens of the proposed assessments, that the assessment limitations of the Majority Protest Act should be disregarded, that the improvements should be accomplished under the Improvement Act of 1913, and that serial bonds should be issued under the Improvement Act of 1911. The board also found that the streets in which the improvements were to be constructed were public streets. Thereafter the board authorized the execution of a contract with Southern California Gas Company for the construction of the improvement, accepted a bid from Gross and Company, Inc. for the 1911 improvement bonds and ordered the work to be done.[5]

Upon completion of the proceedings but before actual commencement of work, the county instituted the present validation action.[6] Several property owners and contract purchasers of properties, appearing for themselves as well as others similarly situated, answered the validation petition and challenged the validity of the assessment proceedings on numerous grounds, including the "one-person, one-vote" attack on the majority protest provisions of the applicable statutes. Gross and Company, Inc. responded to the validation petition and requested a judicial declaration concerning the power of the board of supervisors to enter into a negotiated construction contract with the Southern California Gas Co. without competitive bidding and the legality of the contemplated transfer of title to the improvements to the utility on completion of the work.

---

[4] Division 7, Streets and Highways Code.

[5] The board also adopted a resolution ordering that refunds received by the county from the utility for subsequent connections to the distribution system would, after deduction of administrative expenses, be refunded to the property owners assessed for the improvements.

[6] The action was instituted pursuant to section 860 et seq. of the Code of Civil Procedure and section 10601 of the Streets and Highways Code.

Following trial on the issues raised by the petition and answers, the court made findings in favor of the county, concluded that the assessment proceedings, contract and bonds were valid and entered a judgment so decreeing. The property owners have appealed from the judgment. Gross and Company, Inc. did not appeal but has filed a brief as an interested party urging this court to uphold the judgment particularly as it relates to the legality of the contract with the Southern California Gas Co.

Appellants attack the validation decree on the following grounds: (1) The majority protest schemes provided by the principal act and the Majority Protest Act violate the "one-person, one-vote" principle; (2) the contemplated transfer of title to the improvements to the gas company to be maintained and operated by it as a part of its system constitutes a gift of public property in violation of article XIII, section 25 of the state Constitution; (3) the resolution of the board of supervisors to disregard the assessment limitations of the Majority Protest Act lacked the requisite four-fifths vote because one of the voting supervisors was disqualified by reason of a conflict of interest; (4) certain procedural requirements of the assessment proceedings were not followed; and (5) the evidence does not support the trial court's finding that the streets in which the distribution system is to be constructed were public streets. For the reasons which follow, we have concluded that the contentions are nonmeritorious.

I

### VALIDITY OF THE MAJORITY PROTEST SCHEMES

Both the Improvement Act of 1913 under which the improvements are to be constructed and the Majority Protest Act provide for landowner protests to the proposed improvement. At the time these proceedings were conducted, the Improvement Act of 1913 provided that if written protests against the improvement were made by "the owners of more than one-half of the area of the land included within the assessment district," further proceedings are barred unless the protests are overruled by four-fifths vote of the legislative body conducting the proceedings.[7] (Sts.

---

[7]Section 10311 of the Streets and Highways Code was amended in 1970, effective November 23, 1970, to provide for termination of the proceedings if protest is made by "owners of more than one-half of the area of the *land to be assessed for the improvements* . . . ." (Italics supplied.)

Section 10011 of the Streets and Highways Code defines "owner" as follows: " 'Owner' means the person owning the fee, or the person in whose name the legal title to the property appears, by deed duly recorded in the county recorder's office of the county in which the property is situated, or the person in possession of the property or buildings under claim of, or exercising acts of ownership over the same for himself, or as the executor, administrator, or guardian of the owner. If the property is leased, the possession of the tenant or lessee holding and occupying such property shall be deemed to be the possession of the owner."

& Hy. Code, § 10311.) Under the Majority Protest Act, upon protest by owners of the majority of the land area proposed to be assessed, the proceedings must be abandoned. (Sts. & Hy. Code, § 2930; *Hoffman* v. *City of Red Bluff*, 63 Cal.2d 584, 588 [47 Cal.Rptr. 553, 407 P.2d 857]; *City of Del Mar* v. *Burnett*, 223 Cal.App.2d 754, 757-758 [35 Cal.Rptr. 920].)[8]

Appellants contend that the majority protest scheme is in effect a "referendum election" and as such is violative of the "one-person, one-vote" principle in two respects: (1) The use of land area as the measure of the sufficiency of protests discriminates against small landowners, and (2) the exclusion of resident nonlandowners disenfranchises persons who will be substantially affected by the decision to construct the improvements. For the reasons which follow, we have concluded that the majority protest scheme is not subject to the strictures of the "one-person, one-vote" principle and does not otherwise offend the equal protection clause of the Fourteenth Amendment.

The issue which underlies appellants' "one-person, one-vote" attack on the majority protest scheme involves the choice of the proper equal protection standard by which the validity of the protest scheme must be tested. In several recent significant decisions, our Supreme Court has summarized as follows the "two-level" tests evolved by the United States Supreme Court for the evaluation of legislative classifications challenged on equal protection grounds: "In the area of economic regulation, the high court has exercised restraint, investing legislation with a presumption of constitutionality and requiring merely that distinctions drawn by a challenged statute bear some rational relationship to a conceivable legitimate state purpose. [Citations.] [¶] On the other hand, in cases involving 'suspect classifications' or touching on 'fundamental interests,' the court has adopted an attitude of active and critical analysis, subjecting the classification to strict scrutiny. [Citations.] Under the strict standard applied in such cases, the state bears the burden of establishing not only that it has a *compelling* interest which justifies the law but that the distinctions drawn by the law are *necessary* to further its purpose." (Italics supplied.) (*Westbrook* v. *Mihaly*, 2 Cal.3d 765, 784-785 [87 Cal.Rptr. 839, 471 P.2d 487] [vacated on other grounds, 403 U.S. 915 (29 L.Ed.2d 692, 91 S.Ct. 224)];

---

[8]When the improvement is for sewerage or drainage facilities, the majority protest may be overruled by a four-fifths vote of the legislative body. (Sts. & Hy. Code, § 2932; *Hoffman* v. *City of Red Bluff*, 63 Cal.2d 584, 588-589 [47 Cal.Rptr. 553, 407 P.2d 857].)

Where proceedings are conducted by a chartered city or county or chartered city and county, a majority protest may be overruled by four-fifths vote of the legislative body without regard to the nature of the improvement. (Cal. Const., art. XIII, § 17.)

*Serrano* v. *Priest,* 5 Cal.3d 584, 597 [96 Cal.Rptr. 601, 487 P.2d 1241]; *In re Antazo,* 3 Cal.3d 100, 110-111 [89 Cal.Rptr. 225, 473 P.2d 999].)

Interests determined to be "fundamental" and therefore deserving of special judicial scrutiny under the equal protection clause have been held to include the right to vote (*Reynolds* v. *Sims,* 377 U.S. 533 [12 L.Ed.2d 506, 84 S.Ct. 1362]), rights of a defendant in a criminal case (*Griffin* v. *Illinois,* 351 U.S. 12 [100 L.Ed. 891, 76 S.Ct. 585, 55 A.L.R.2d 1055]), right of procreation (*Skinner* v. *Oklahoma,* 316 U.S. 535 [86 L.Ed. 1655, 62 S.Ct. 1110]), and opportunity for equal education (*Serrano* v. *Priest, supra,* pp. 604-610; *Developments—Equal Protection,* 82 Harv. L.Rev. 1065, 1127-1128). No precise standards have been articulated to identify a particular interest as being "fundamental"; the United States Supreme Court has treated the cases on an ad hoc basis. (See *Developments—Equal Protection, supra,* 82 Harv. L.Rev. 1065, 1130.) In the recent case of *Dandridge* v. *Williams,* 397 U.S. 471 [25 L.Ed.2d 491, 90 S.Ct. 1153], the court indicated that the types of interests deemed to be "fundamental" under the equal protection clause may be rather limited. In declining to apply the strict standard of review to a state program for allocation of AFDC welfare grants, the court stated at page 484 [25 L.Ed.2d at page 501]: "For here we deal with state regulation in the social and economic field, *not affecting freedoms guaranteed by the Bill of Rights,* and claimed to violate the Fourteenth Amendment only because the regulation results in some disparity in grants of welfare payments to the largest AFDC families." (Italics supplied.) The question we must decide is whether the majority protest scheme involves the same "fundamental" interest underlying the elective franchise.

The "consistent theme" of recent United States Supreme Court "one-person, one-vote" decisions is that "the right to vote in an election is protected by the United States Constitution against dilution or debasement" (*Hadley* v. *Junior College District,* 397 U.S. 50, 54 [25 L.Ed.2d 45, 50, 90 S.Ct. 791]) because the elective franchise "constitute[s] the foundation of our representative society" (*Kramer* v. *Union Free School Dist.,* 395 U.S. 621, 626 [23 L.Ed.2d 583, 588, 89 S.Ct. 1886]) and is "preservative of other basic civil and political rights" (*Reynolds* v. *Sims, supra,* 377 U.S. 533, 562 [12 L.Ed.2d 506, 527]). ■ The "one-person, one-vote" principle applies not only to election of federal and state officers, but to elections of public officials serving local governmental units "with general governmental powers over an entire geographic area" (*Avery* v. *Midland County,* 390 U.S. 474, 485-486 [20 L.Ed.2d 45, 54, 88 S.Ct. 1114]), such as counties and cities (*Avery* v. *Midland County, supra; Wiltsie* v. *Board of Supervisors,* 65 Cal.2d 314 [54 Cal.Rptr. 320, 419 P.2d 440]), and entities performing more limited governmental functions such

as school districts (*Hadley* v. *Junior College District, supra*). Our Supreme Court recently held the principle to be applicable to the election of trustees of a special improvement district possessing most of the same powers as a city (*Burrey* v. *Embarcadero Mun. Improvement Dist.,* 5 Cal.3d 671 [97 Cal.Rptr. 203, 488 P.2d 395]).

Strict scrutiny of legislative restrictions on the right to vote extends to elections on local propositions having a substantial impact on all citizens. (*Phoenix* v. *Kolodziejski,* 399 U.S. 204 [26 L.Ed.2d 523, 90 S.Ct. 1990] [general obligation bonds]; *Cipriano* v. *City of Houma,* 395 U.S. 701 [23 L.Ed.2d 647, 89 S.Ct. 1897] [municipal revenue bonds]; *Westbrook* v. *Mihaly, supra,* 2 Cal.3d 765 (vacated on other grounds 403 U.S. 915) [school district bonds].) The determinative factor has been held to be the fundamental nature of the voting franchise and not the type or purpose of the election. (*Hadley* v. *Junior College District, supra,* 397 U.S. 50, 59 [25 L.Ed.2d 45, 52]; *Kramer* v. *Union Free School Dist., supra,* 395 U.S. 621, 629 [23 L.Ed.2d 583, 590]; *Westbrook* v. *Mihaly, supra,* 2 Cal.3d 765, 786.) ■ Consequently, "once a State has decided to use the process of popular election and 'once the class of voters is chosen and their qualifications specified, . . . [there is] no constitutional way by which equality of voting power may be evaded.'" (*Hadley* v. *Junior College District, supra,* 397 U.S. 50, 59 [25 L.Ed.2d 45, 52]; *Kramer* v. *Union Free School Dist., supra,* 395 U.S. 621, 629.)

■ However, the "one-person, one-vote" principle applies only where the state has provided, or is constitutionally required to provide, for public participation in governmental decision-making through the ballot box. Thus, where the law provided for the selection of a public official by appointment rather than by popular election, the "one-person, one-vote" principle was held to have "no relevancy." (*Sailors* v. *Kent Board of Education,* 387 U.S. 105, 111 [18 L.Ed.2d 650, 655, 87 S.Ct. 1549]; *People ex rel. Younger* v. *County of El Dorado,* 5 Cal.3d 480, 504-505 [96 Cal. Rptr. 553, 487 P.2d 1193].)

In the special assessment proceedings in question, an election is neither provided nor is one constitutionally required. The Legislature may validly vest in the local legislative body the sole power to decide whether the public improvement shall be constructed. (*Goodrich* v. *Detroit,* 184 U.S. 432 [46 L.Ed. 627, 22 S.Ct. 397]; *Ferry* v. *O'Brien,* 188 Cal. 629, 636-637 [206 P. 449].) Although the majority protest scheme in question bears some superficial resemblance to a referendum election, it lacks many of the essential attributes of an election in the popular sense. It does not provide an opportunity for an affirmative "vote" in favor of the governmental decision; it presumes that those who fail to register a written protest favor

the governmental decision; the safeguards of secret balloting are not provided; unlike a vote at an election, a protestant may change his mind and withdraw his protest at any time before the conclusion of the protest hearing. (Sts. & Hy. Code, § 2930.) The majority protest scheme is thus not an election in fact. However, we do not rest our decision on this narrow ground. We pursue our inquiry into what we believe to be the fundamental issue posed by this appeal.

While the protest scheme may not be an election in fact, it nevertheless does involve limited public participation in a governmental process. The question is whether it therefore touches the same "fundamental interest" as the right to vote. In the resolution of this thorny issue, the subject as well as the impact of the governmental decision are significant factors. We are mindful of the decisions in which the United States Supreme Court and our high court have declared that where legislative restrictions are imposed on the voting franchise, the nature of the right asserted and not the purpose or type of election determines the necessity for close scrutiny. Apart from the fact that the very issue at hand is the nature of the right asserted, the context in which those pronouncements were made does not justify the broad generalization that the nature and impact of the governmental decision are never relevant factors even where an election is provided. They were made in response to the suggestion that the "one-person, one-vote" principle should only apply to elections of lawmakers as distinguished from administrators (*Hadley* v. *Junior College District, supra,* 397 U.S. 50; see *Kramer* v. *Union Free School Dist., supra,* 395 U.S. 621) or, at the very most, to elections of public officials and not to elections involving other governmental choices such as those involving public fiscal matters (*Westbrook* v. *Mihaly, supra,* 2 Cal.3d 765 [vacated on other grounds 403 U.S. 915]). Those cases all involved governmental decisions having a substantial effect on all citizens. The election of a public official of an entity with general governmental power "over an entire geographic area," whether his duties be legislative or administrative, affects all citizens; the decision to incur a municipal indebtedness, whether it be by issuance of general obligation bonds or revenue bonds, likewise has a substantial impact on all residents. The principle we derive from the cases is that where a governmental decision subject to a referendum will have a substantial impact on all residents, the need for strict judicial scrutiny turns, not on the purpose of the election, but on the fundamental nature of the elective franchise. ■ As the court stated in *Phoenix* v. *Kolodziejski, supra,* 399 U.S. at page 209 [26 L.Ed.2d at page 527], "when *all citizens are affected in important ways* by a governmental decision subject to a referendum, the Constitution does not permit weighted voting or the

exclusion of otherwise qualified citizens from the franchise." (Italics supplied.) That the type of election may, however, in certain circumstances be a relevant factor was expressly recognized in *Hadley* v. *Junior College District, supra,* 397 U.S. 50, 56 [25 L.Ed.2d 45, 51] where the court observed: "It is of course possible that there might be cases in which a State elects certain functionaries whose duties are so far removed from normal governmental activities and so disproportionately effect different groups that a popular election in compliance with *Reynolds, supra,* might not be required, . . ." If those considerations can be relevant where an election has in fact been provided, they are necessarily significant in determining whether other more limited forms of public participation in governmental decision-making involve the same "fundamental interest" as the right to vote.

There are myriad situations in which government provides for some form of participation by interested persons in certain types of governmental decision-making other than through an election. In order to determine whether a particular scheme of participation involves the same fundamental interest as the right of suffrage, it is necessary to consider such factors as the nature of the governmental decision, whether it is a decision which has been a traditional subject of popular referendum, its impact on the citizenry, and the nature and extent of participation accorded by the scheme. Situations may be envisioned where all residents would be so affected in important ways by a governmental decision—for example, a general property tax rate increase, the incurrence of a municipal bonded indebtedness for public improvements benefiting the public generally, the adoption of a regulatory ordinance, or the selection of a public official— that a protest referendum scheme concerning such decision should properly be subjected to the same strict judicial scrutiny to which legislative restrictions on the right to vote at a popular election are subjected. However, this is not such a case.

The special assessment proceeding under the Improvement Act of 1913 is not one for the formation of a public entity empowered "to exercise general governmental powers." The "district" simply denotes the land area benefited by the proposed improvements and to be assessed for the costs thereof. The assessment proceeding is an administrative procedure provided by the Legislature to enable authorized governmental entities to provide public improvements of special benefit to only a limited area and to spread the costs upon the lands so benefited in proportion to the benefits conferred.[9]

---

[9]The following extract from an Assembly Legislative Committee Report contains

Landowners have no constitutional right to have the proceedings abandoned or abated by protests; the right to protest the proposed improvement is purely a creature of statute. (*Cowart* v. *Union Paving Co.,* 216 Cal. 375, 380 [14 P.2d 764, 83 A.L.R. 1185]; *Ferry* v. *O'Brien, supra,* 188 Cal. 629, 636-637; *Shepherd* v. *Chapin,* 45 Cal.App. 645, 652 [188 P. 571]; see *Spencer* v. *Merchant,* 125 U.S. 345 [31 L.Ed. 763, 8 S.Ct. 921].) █ "It is settled that the determination *whether* a public improvement shall be constructed is unaffected by the constitutional guarantee of due process of law, and no opportunity to protest the making of an improvement need be given." (*Hoffman* v. *City of Red Bluff, supra,* 63 Cal.2d 584, 594.)[10] Nor is the governmental decision to make the improvement one which is subject to the initiative or referendum rights reserved to electors by the state Constitution. (*Starbuck* v. *City of Fullerton,* 34 Cal.App. 683 [168 P. 583]; see *Johnston* v. *City of Claremont,* 49 Cal.2d 826, 836 [323 P.2d 71].)

█ Unlike the general obligation bonds in *Phoenix* v. *Kolodziejski, supra,* 399 U.S. 204, or the revenue bonds in *Cipriano* v. *City of Houma, supra,* 395 U.S. 701, the 1911 improvement bonds do not represent an indebtedness of the governmental entity conducting the proceedings. The bonds must expressly provide that neither the entity nor any officer thereof shall be liable for the payment of the principal or interest. (Sts. & Hy. Code, § 6460.) Each bond is issued against a specifically described parcel

---

an excellent summation of the distinction between a special assessment proceeding under the 1913 and 1911 Improvement Acts and a bond proceeding:

"A special assessment is a lien on the property. The lien is imposed as a result of a procedure which assigns to individual pieces of property a proportionate share in the cost of a public improvement which has directly benefited that property. Traditionally, various political subdivisions have used some form of special assessment proceeding to finance those types of necessary public improvements which benefited only a limited area (*e.g.,* streets, storm and sanitary sewers, sidewalks, curbs, etc.). Such a procedure has the obvious advantage of billing only those property owners immediately benefited by the improvement and, furthermore, of billing them in proportion to the benefit they receive. In addition, the procedure compels property owners who may not favor the improvement in question to pay their fair share of the project. Another advantage of these assessment procedures is that after the lien has attached, the property owner has the option of paying this obligation in cash or in installments over a period of years. Thus the property owner who is compelled to accept the financial burden of the assessment is relieved of any undue hardship which might occur if full payment were demanded immediately.

"The special assessment lien, it must be noted, is prior in right to all previous contract liens, including mortgages. It is superior to all other liens except a lien for taxes, with which it is on a parity." (6 Assem. Interim Com. Report No. 20 (1961-1963).)

[10]Before the assessment is made, however, due process requires that the affected owners be given notice and opportunity to object to the proposed assessment of their property. (*Londoner* v. *Denver,* 210 U.S. 373 [52 L.Ed. 1103, 28 S.Ct. 708]; *Ferry* v. *O'Brien, supra,* 188 Cal. 629, 636-639; *Hoffman* v. *City of Red Bluff, supra,* 63 Cal.2d 584, 594.)

of land. In event of default in the payment of principal or interest, the parcel described in the bond is subject to foreclosure and sale on demand of the bond holder. (Sts. & Hy. Code, § 6500.) Except as to tax liens, the assessment lien is superior to all liens, including mortgages. (*Cullinan* v. *Grey*, 18 Cal.2d 247, 252 [115 P.2d 460]; *O'Dea* v. *Mitchell*, 144 Cal. 374, 381 [77 P. 1020]; *San Mateo County Bank* v. *Dupret*, 124 Cal.App. 395, 396 [12 P.2d 669].)

The governmental decision involved in the instant case is not one which affects all citizens in the county in "important ways"; within the "district" the impact on the landowners to be assessed is "disproportionate" to any remote effect it may have on resident nonlandowners; the landowners' right to protest the improvement is not a fundamental right guaranteed under the due process clause; and the governmental decision is not one which has been traditionally a subject of popular referendum.[11] We canot equate protest rights under the majority protest scheme in question with the voting franchise. It is our conclusion that the protest scheme is valid under the equal protection clause if it meets the rational basis test.

Since only those landowners who are directly benefited are charged with the cost of the improvements in proportion to the benefit conferred and since land area bears some reasonable relationship to the amount of the assessment, there is a rational basis for making the governmental decision subject to landowners' protest and in measuring the sufficiency of the protest by the land area protested. The protest scheme in question does not leave small landowners at the mercy of larger owners. The debt limitation provisions of the Majority Protest Act protect all owners against the abuse of over-assessment. Moreover, the final decision to proceed with the improvements rests with the board of supervisors, a representative body duly elected under "one-person, one-vote" principles. The board must determine that the project is feasible and that the burdens of the assessments are reasonable.

We conclude that the majority protest scheme in the instant case does not offend the equal protection clause of the Fourteenth Amendment.

II

VALIDITY OF THE CONTRACT WITH
SOUTHERN CALIFORNIA GAS CO.

The contract for the construction of the distribution system by the Southern California Gas Co. provides that upon completion of the work,

---

[11]To our knowledge no state provides for an election in a special assessment proceeding of the type involved in the instant case. (*Recent Developments*, 67 Mich. L.Rev. 1260, 1268, fn. 43.)

the system will be owned and operated by the utility to provide domestic gas service to the lands within the district. Appellants make the bald assertion, without supporting authorities, that the arrangement constitutes a gift of public property in violation of article XIII, section 25, of the California Constitution. The contention is without substance.

The contract with the gas company was entered into pursuant to the express provisions of the Improvement Act of 1913. The act authorizes its use for the installation in public streets of "[m]ains, pipes, and other necessary works and appliances for providing gas service" (Sts. & Hy. Code, § 10100) and empowers the legislative body to enter into a contract with a regulated public utility for the installation of the improvements (Sts. & Hy. Code, § 10110) and for the vesting of title to the improvements in the utility to be "used, operated, maintained and managed by it as a part of [its] system" (Sts. & Hy. Code, § 10111).

The fact title to the improvements vests in the utility upon completion of the work does not invalidate the arrangement. Public funds may be expended for a public purpose even though there may be incidental benefits to private persons. (*The Housing Authority* v. *Dockweiler,* 14 Cal.2d 437, 451 [94 P.2d 794]; *Veterans' Welfare Board* v. *Jordan,* 189 Cal. 124, 145 [208 P. 284, 22 A.L.R. 1515].) Expenditure of public funds to provide inhabitants of a municipality with utility services is an expenditure for a public purpose. "[W]hen a municipality, lawfully so empowered, undertakes to furnish, to its inhabitants who will pay therefor, the utilities and facilities of urban life, it is thereby performing a municipal and public function." (*Irish* v. *Hahn,* 208 Cal. 339, 344 [281 P. 385, 66 A.L.R. 1382].) The fact that the improvements will be owned and operated by a public utility does not detract from the public character of the improvements. The gas company is a regulated public utility obligated by law to manage and operate its system to provide service to the inhabitants of the lands within the district. ■ "The test of the public character of an improvement is the use to which it is to be put, not the person by whom it is to be operated." (*Milheim* v. *Moffat Tunnel Improvement Dist.,* 262 U.S. 710, 719 [67 L.Ed. 1194, 1200, 43 S.Ct. 694].)

■ Gross and Company, Inc., the successful bidder for the 1911 improvement bonds, raises an additional issue pertaining to the validity of the contract with the utility; namely, whether the fact that the contract was awarded without competitive bidding rendered it invalid. The Improvement Act of 1913 provides that contracts for improvements shall be let to the lowest responsible bidder after competitive bidding. (Sts. & Hy. Code, § 10501.)

Where the improvements are to be owned, managed and operated by a

regulated public utility upon completion of construction, the provisions of the Improvement Act of 1913 authorize the legislative body to enter into a contract such as was entered into in the instant case. (Sts. & Hy. Code, § 10110.) Section 10110 does not require competitive bidding. Competitive bidding is necessary only when required by statute.

Moreover, where the nature of the improvements to be constructed or services to be provided are such that competitive proposals would be unavailing or not produce an advantage, statutes requiring competitive bidding do not apply. (*Los Angeles Dredging Co.* v. *Long Beach*, 210 Cal. 348, 354 [291 P. 839, 71 A.L.R. 161]; *Los Angeles Gas & Elec. Corp.* v. *Los Angeles*, 188 Cal. 307, 319 [205 P. 125].) In the instant case Southern California Gas Co. has been issued a certificate by the Public Utilities Commission to provide domestic natural gas service to the area in question and the service rates and charges for construction of like facilities were governed by a rate schedule approved by the commission. In these circumstances competitive bidding would have been unavailing and was therefore not required.

## III

### DISREGARD OF THE ASSESSMENT LIMITATIONS OF THE MAJORITY PROTEST ACT

▉ The Majority Protest Act provides that if the investigation report shows that the estimated assessment upon any parcel would exceed one-half of its "true value"[12] or that the total estimated cost of the improvements will exceed one-half of the "true value" of all lands proposed to be assessed, the proceedings must be abandoned or be modified to bring the cost within those limits unless the limitations are "overruled" by the legislative body. (Sts. & Hy. Code, § 2900.) The legislative body is empowered to disregard the assessment limitations if it finds by a four-fifths vote of all of its members that the proposed project is feasible and that the lands proposed to be assessed will be able to carry the burdens of the proposed assessments. (Sts. & Hy. Code, § 2905.)

In the present case the engineer's investigation report disclosed that the total estimated cost of the improvement would exceed one-half of the total "true value" of all lands to be assessed by $26,475. The board of supervisors by a vote of 4 to 0, one member being absent, adopted a resolution to disregard the assessment limitation of the Majority Protest Act. Appellants urge that one member of the board who voted for the resolution was disqualified because he had received a campaign contribution

---

[12]Under the statute, "true value" is double the assessed value. (Sts. & Hy. Code, § 2983.)

from the firm of civil engineers employed by the board as engineer of work and that consequently the resolution to disregard the assessment limitation lacked the requisite four-fifths vote.

The only facts adduced on the issue of disqualification were the following: The engineering firm contributed $300 to the board member's 1966 primary election campaign fund. A $50 contribution was made on May 31, 1966, and a $250 contribution on June 2, 1966. The campaign statement of the supervisor showed a total contribution from all sources of $6,355. The contract for the employment of the engineer for his services in connection with the special assessment proceedings was entered into on October 14, 1968.

On the foregoing evidence the court found it to be untrue that the supervisor was disqualified from voting on the resolution to disregard the assessment limitations. That finding was clearly compelled on the showing made by appellants. There was no evidence of impropriety either on the part of the supervisor or the engineer. There was no evidence that the campaign contributions were made in return for a promise, express or implied, that the engineers would be awarded the contract in question or any other contract with the county.

IV

COMPLIANCE WITH THE PROCEDURAL REQUIREMENTS
OF THE MUNICIPAL IMPROVEMENT ACT OF 1913

A general statute governing special assessment proceedings provides that the "proposed boundaries of the assessment district to be assessed" must be described by resolution adopted by the legislative body prior to the hearing on the formation or extent of the district and that the description must be by reference to a map "which shall indicate by a boundary line the extent of the territory included in the proposed assessment district." (Sts. & Hy. Code, § 3110.) The clerk of the legislative body must file the original of the map in his office and, within 15 days after the adoption of the resolution fixing the time and place of hearing on the formation of the district, but in no event later than 15 days before the hearing, file a copy of the map with the county recorder. (Sts. & Hy. Code, § 3111.) The principal act (Improvement Act of 1913) defines "assessment district" as "the district of land to be benefited by the improvement and to be specially assessed to pay the costs and expenses of the improvement . . . ." (Sts. & Hy. Code, § 10008.)

Appellants contend the county failed to comply with the statutory requirements in that the copy of the map of the district boundaries filed

with the county recorder in the instant proceedings failed to show "any interior boundaries of land-locked areas of nil assessment." To put it another way, appellants appear to be urging that the exterior boundaries of the district should have only encompassed lands which are to be assessed for the improvement.

The record discloses that the map filed with the county recorder delineated the exterior boundaries of the proposed district but included within those boundaries were islands of "nil assessed lands," that is, lands which would not be benefited by the proposed improvement and were not therefore to be assessed.

The county urges that the fact that "nonassessable lands" were included within the exterior boundaries did not invalidate the proceedings citing *Southlands Co.* v. *City of San Diego,* 211 Cal. 646, 667 [297 P. 521]: "It is too well settled to require citation of authority that nonassessable land may be included within an assessment district, without affecting the validity of the district." An examination of that case reveals that the "nonassessable lands" referred to were government-owned "nonassessable lands," not lands which were "nonassessable" because they would derive no benefit from the improvement. Moreover, *Southlands, supra,* did not involve proceedings under the Improvement Act of 1913; the proceedings there in question were undertaken under the Acquisition and Improvement Act of 1925.

The propriety of including nonbenefited lands within the boundaries of an assessment district formed under the Improvement Act of 1913 was considered in *Azzaro* v. *Board of Supervisors,* 273 Cal.App.2d 16 [77 Cal. Rptr. 692]. The court disposed of the issue with the following comment: "Plaintiffs' rely upon the basic proposition that section 10008 [the section of the Improvement Act of 1913 defining the meaning of "assessment district" as used in that act] forbids the inclusion within a district of property that is not to be benefited by the improvement. With this we agree." (273 Cal.App.2d at p. 18.) Later in the opinion the court stated: "It is the purpose of section 10008 to insure that property noncontiguous to the improvement is not made a part of the district unless it is benefited by the proposed improvement and, a fortiori, that there shall be no assessment unless there is a benefit." Property not to be benefited and not to be assessed should perhaps, therefore, have been delineated within the exterior boundaries of the district in the present case.

The foregoing irregularity, if it be such, however, did not invalidate the proceedings. There is no showing of any prejudice resulting from the inclusion within the exterior boundaries of lands that were not to be assessed and in essence were not to be a part of the district. The record reveals that the assessment schedule, which was timely filed, listed all parcels within the proposed district which were to be assessed and those

which would not. The record reveals that all interested persons were given notice of and afforded an opportunity to be heard with respect to the lands to be assessed as well as the extent of the district. The deficiency in the map was an irregularity that was not of due process proportion and did not invalidate the proceedings. (*McGarry* v. *Ellis,* 54 Cal.App. 622, 626 [202 P. 463]; see *Brill* v. *City of Los Angeles,* 209 Cal. 705, 708 [289 P. 850]; *Perine* v. *Erzgraber,* 102 Cal. 234 [36 P. 585]; *Capital Freight Lines* v. *City of Sacramento,* 206 Cal.App.2d 279, 283 [23 Cal.Rptr. 752]; *Hutton* v. *Newhouse,* 41 Cal.App. 689 [183 P. 276].)

## V

### PUBLIC CHARACTER OF THE STREETS

 Finally, appellants attack the proceedings and validation decree on the ground the evidence did not support the court's finding that the streets in which the distribution lines are to be constructed are public streets. The contention is without substance.

The evidence adduced before the board of supervisors and the trial court revealed that some of the streets in which the improvements were to be constructed were depicted and offered for dedication as public streets on recorded maps but had not been officially accepted by the county. However, there was evidence that all such streets had been improved in varying degrees and had been used by the public. Some of the streets were paved, some were graveled, some were simply graded earth and some were characterized as "trails."

 A common law dedication may be proved either (1) by showing acquiescence and consent to public use under circumstances which negate "the idea that the use was under a license," or (2) by open and continuous adverse public use for the prescriptive period. (*Union Transp. Co.* v. *Sacramento County,* 42 Cal.2d 235, 240-241 [267 P.2d 10]; *Gion* v. *City of Santa Cruz,* 2 Cal.3d 29, 38 [84 Cal.Rptr. 162, 465 P.2d 50].) When dedication by acquiescence for a period of less than five years is claimed, the owner's actual consent to the dedication must be proved and his intent is the crucial factor. (*Union Transp. Co.* v. *Sacramento County, supra,* p. 241.)

 In the instant case there was substantial evidence to support the finding of dedication by acquiescence and consent. The recorded tract maps depicted the streets as public streets and offered them for dedication. Though of an undetermined duration, there was evidence of continuous public use. There was testimony by the county right-of-way agent that there were no "private road" signs or barriers forbidding public use of the streets

and that fence lines of adjoining properties extended only to the exterior limits of the street as shown on the recorded maps. The evidence was sufficient to support a finding of dedication by acquiescence and consent.

Judgment is affirmed.

Gardner, P. J., and Kerrigan, J., concurred.