CITY OF PHOENIX ᴇᴛ ᴀʟ. *v.* KOLODZIEJSKI

No. 1066.   Argued March 31, 1970—Decided June 23, 1970

*Rex E. Lee* argued the cause for appellants.   With him on the brief were *Robert J. Backstein* and *Alan K. Polley.*

*Fred H. Rosenfeld* argued the cause for appellee.   With him on the brief was *Ivan Robinette.*

Briefs of *amici curiae* were filed by *Jack P. F. Gremillion,* Attorney General, *Edward Donald Moseley, Harold B. Judell,* and *James Hugh Martin* for the State

of Louisiana; by *Phillip H. Holm* for the Parish School Board of Caddo Parish; by *John F. Ward, Jr., Fred G. Benton, Jr.,* and *Fred G. Benton, Sr.,* for the Louisiana School Boards Association; by *Myles P. Tallmadge* for Poudre School District R–1 of Larimer County, Colorado; and by *Richard H. Frank* for Elizabeth M. Axtell et al.

MR. JUSTICE WHITE delivered the opinion of the Court.

In *Kramer* v. *Union Free School District,* 395 U. S. 621 (1969), this Court held that a State could not restrict the vote in school district elections to owners and lessees of real property and parents of school children because the exclusion of otherwise qualified voters was not shown to be necessary to promote a compelling state interest. This ruling, by its terms applicable to elections of public officials, was extended to elections for the approval of revenue bonds to finance local improvements in *Cipriano* v. *City of Houma,* 395 U. S. 701 (1969). Our decision in *Cipriano* did not, however, reach the question now presented for decision: Does the Federal Constitution permit a State to restrict to real property taxpayers the vote in elections to approve the issuance of general obligation bonds?

This question arises in the following factual setting: On June 10, 1969, the City of Phoenix, Arizona, held an election to authorize the issuance of $60,450,000 in general obligation bonds as well as certain revenue bonds. Under Arizona law, property taxes were to be levied to service this indebtedness, although the city was legally privileged to use other revenues for this purpose.[1] The

---

[1] The relevant Arizona statute provides as follows:

"A. After the bonds are issued, the governing body or board shall enter upon its minutes a record of the bonds sold, their numbers and dates, and shall annually levy and cause to be collected a tax, at the same time and in the same manner as other taxes are levied and collected upon all taxable property in such political

general obligation bonds were to be issued to finance various municipal improvements, with the largest amounts to go for the city sewer system, parks and playgrounds, police and public safety buildings, and libraries. Pursuant to Arizona constitutional and statutory provisions,[2] only otherwise qualified voters who were also real property taxpayers were permitted to vote on these bond issues. All of the bond issues submitted to the voters were approved by a majority of those voting.

On June 16, 1969, six days after the election in Phoenix, this Court held in *Cipriano* v. *City of Houma, supra,* that restricting the franchise to property taxpayers in elections on revenue bonds violated the Equal Protection Clause of the Fourteenth Amendment. That ruling was applied to the case before the Court in which under local law the authorization of the revenue bonds was not yet final when the challenge to the election was raised in the District Court. On August 1, 1969, appellee Kolodziejski, a Phoenix resident who was otherwise qualified to vote but who owned no real property, filed

---

subdivision, sufficient to pay the interest on the bonds when due, and shall likewise annually levy a tax sufficient to redeem the bonds when they mature.

"B. Monies derived from the levy of the tax when collected shall constitute a fund for payment of interest and the bonds. The fund shall be kept separately and shall be known as the 'Interest Fund' and 'Redemption Fund.'" Ariz. Rev. Stat. Ann. § 35-458 (1956).

In *Allison* v. *City of Phoenix*, 44 Ariz. 66, 33 P. 2d 927 (1934), the Arizona Supreme Court ruled that the predecessor of this section permitted an issuing municipality to use other funds for debt service if such funds were available. In this case the parties have stipulated that for the 1969–1970 fiscal year $3,244,773 of the city's total general obligation debt service requirement of $5,594,937 was met from sources other than ad valorem property taxes and that this apportionment of debt service burden is typical of recent years.

[2] Ariz. Const., Art. 7, § 13, Art. 9, § 8; Ariz. Rev. Stat. Ann. §§ 9-523, 35-452 (1956), § 35-455 (Supp. 1969).

her complaint in the United States District Court for the District of Arizona challenging the constitutionality of the restriction on the franchise in Arizona bond elections and attacking the validity of the June 1969 election approving the Phoenix bond issues. A District Court of three judges was convened. In the District Court, appellants conceded that, under this Court's decisions in *Cipriano* and *Kramer, supra,* the bond election was invalid with regard to the revenue bonds that had been approved. The District Court perceived no significant difference between revenue bonds and general obligation bonds and therefore held that the exclusion of nonproperty-owning voters from the election on the general obligation bonds was unconstitutional under *Cipriano* and *Kramer.* Because the authorization of the Phoenix general obligation bonds was not final on the date of the *Cipriano* decision, the court held the *Cipriano* rule applicable and declared the June 10, 1969, bond election invalid. The appellants were enjoined from taking further action to issue the bonds approved in that election. The City of Phoenix and the members of the City Council appealed from the judgment of the District Court with respect to the general obligation bonds. We noted probable jurisdiction, 397 U. S. 903 (1970). We affirm the judgment of the District Court but do not agree that the ruling in this case should be retroactive to the date of the *Cipriano* decision.

I

In *Cipriano v. City of Houma, supra,* the denial of the franchise to nonproperty owners in elections on revenue bonds was held to be a denial of the Fourteenth Amendment rights of the nonproperty owners since they, as well as property owners, are substantially affected by the issuance of revenue bonds to finance municipal utilities. It is now argued that the rationale of *Cipriano* does not render unconstitutional the exclusion of non-

property owners from voting in elections on general obligation bonds.

The argument proceeds on two related fronts. First, it is said that the Arizona statutes require that property taxes be levied in an amount sufficient to service the general obligation bonds,[3] the law thus expressly placing a special burden on property owners for the benefit of the entire community. Second, and more generally, whereas revenue bonds are secured by the revenues from the operation of particular facilities and these revenues may be earned from both property owners and non-property owners, general obligation bonds are secured by the general taxing power of the issuing municipality. Since most municipalities rely to a substantial extent on property tax revenues which will be used to make debt service payments if other revenue sources prove insufficient,[4] general obligation bonds are in effect a lien on the real property subject to taxation by the issuing municipality. Whatever revenues are actually used to service the bonds, an unavoidable potential tax burden is imposed only on those who own realty since that property cannot be moved beyond the reach of the municipality's taxing power. Hence, according to appellants, the State is justified in recognizing the unique interests of real property owners by allowing only property taxpayers to participate in elections to approve the issuance of general obligation bonds.

Concededly, the case of elections to approve general obligation bonds was not decided in *Cipriano* v. *City of Houma, supra.* But we have concluded that the prin-

---

[3] See n. 1, *supra.*

[4] In 1967–1968, property taxes yielded $26.835 billion (approximately 86%) of the $31.171 billion raised in taxes by local governments. U. S. Dept. of Commerce, Bureau of the Census, Governmental Finances in 1967–68, p. 20 (1969).

ciples of that case, and of *Kramer* v. *Union Free School District, supra,* dictate a like result where a State excludes nonproperty taxpayers from voting in elections for the approval of general obligation bonds. The differences between the interests of property owners and the interests of nonproperty owners are not sufficiently substantial to justify excluding the latter from the franchise. This is so for several reasons.

First, it is unquestioned that all residents of Phoenix, property owners and nonproperty owners alike, have a substantial interest in the public facilities and the services available in the city and will be substantially affected by the ultimate outcome of the bond election at issue in this case. Presumptively, when all citizens are affected in important ways by a governmental decision subject to a referendum, the Constitution does not permit weighted voting or the exclusion of otherwise qualified citizens from the franchise. Arizona nevertheless excludes nonproperty owners from participating in bond elections and vests in the majority of individual property owners voting in the election the power to approve or disapprove facilities that the municipal government has determined should be financed by issuing general obligation bonds. Placing such power in property owners alone can be justified only by some overriding interest of those owners that the State is entitled to recognize.

Second, although Arizona law ostensibly calls for the levy of real property taxes to service general obligation bonds, other revenues are legally available for this purpose. According to the parties' stipulation in this case, it is anticipated with respect to the instant bonds, as has been true in the past, that more than half of the debt service requirements will be satisfied not from real property taxes but from revenues from other local taxes paid by nonproperty owners as well as those who own real

property.[5] Not only do those persons excluded from the franchise have a great interest in approving or disapproving municipal improvements, but they will also contribute, as directly as property owners, to the servicing of the bonds by the payment of taxes to be used for this purpose.

Third, the justification for restricting the franchise to the property owners would seem to be strongest in the case of a municipality which, unlike Phoenix, looks only to property tax revenues for servicing general obligation bonds. But even in such a case the justification would be insufficient. Property taxes may be paid initially by property owners, but a significant part of the ultimate burden of each year's tax on rental property will very likely be borne by the tenant rather than the landlord since, as the parties also stipulated in this case, the landlord will treat the property tax as a business expense and normally will be able to pass all or a large part of this cost on to the tenants in the form of higher rent.[6] Since most city residents not owning their

---

[5] For the 1969–1970 fiscal year, the City of Phoenix utilized revenues other than revenues from property taxes to meet over 55% of its general obligation debt service requirements. See n. 1, *supra*.

[6] In this case the parties stipulated that "the amount of money paid as real property taxes is a cost of doing business of the [appellee's] landlord and as such has a material bearing on the cost of the [appellee's] rental payments."

The extent to which a landlord can pass along an increase in property taxes to his tenants generally depends on how changes in rent levels in the municipality affect the amount of rental property demanded—the less responsive the demand for rental property to changes in rent levels, the larger the proportion of property taxes that will ultimately be borne by tenants. See C. Shoup, Public Finance 385–390 (1969); D. Netzer, Economics of the Property Tax 32–40 (1966); Simon, The Incidence of a Tax on Urban Real Property, in Readings in the Economics of Taxation 416 (published by the American Economic Assn. 1959).

own homes are lessees of dwelling units, virtually all residents share the burden of property taxes imposed and used to service general obligation bonds. Moreover, property taxes on commercial property,[7] much of which is owned by corporations having no vote, will be treated as a cost of doing business and will normally be reflected in the prices of goods and services purchased by nonproperty owners and property owners alike.

While in theory the expected future income from real property, and hence property values in a municipality, may depend in part on the predicted future levels of property taxes,[8] the actual impact of an increase in property taxes is problematical.[9] Moreover, to the extent that property values are directly affected by the additional potential tax burden entailed in the bond issue, any adverse effect would normally be offset at least in substantial part by the favorable effects on property values of the improvements to be financed by the bond issue.[10]

---

[7] In 1957, about 28½% of real property taxes paid to local governments in the United States were paid on commercial and industrial properties. See Netzer, *supra,* n. 6, at 19.

[8] In theory, the value of property is the present value of the expected income to be earned from the property in the future; in the case of owner-occupied residences, this "income" is the satisfaction which the homeowners derive from the enjoyment of their residences. Property taxes on rental property will reduce the expected future earnings from the property to the extent that it is expected that the taxes cannot be passed on to tenants in the form of higher rent. See n. 6, *supra.* For owner-occupiers the property tax will reduce the expected "income" net of costs and will thus reduce the value of their property. For a further discussion of this "capitalization" of unshiftable future property taxes, see H. Newman, An Introduction to Public Finance 262 (1968); Shoup, *supra,* n. 6, at 442–443; Netzer, *supra,* n. 6, at 34–36; J. Jensen, Property Taxation in the United States 63–75 (1931).

[9] The empirical evidence on capitalization of unshifted property taxes has been described as "most unsatisfactory." See Netzer, *supra,* n. 6, at 34–35; see also Shoup, *supra,* n. 6, at 443.

[10] See Netzer, *supra,* n. 6, at 34.

It is true that a general obligation bond may be loosely described as a "lien" on the property within the jurisdiction of the municipality in the sense that the issuer undertakes to levy sufficient taxes to service the bond. In theory, if the economy of the issuing city were to collapse, the levy of sufficiently high property taxes on property producing little or no income might result in some cases in defaults, foreclosures, and tax sales. Nothing before us, however, indicates that the possibility of future foreclosures to meet bond obligations significantly affects current real estate values or the ability of the concerned property owner to liquidate his holdings to avoid the risk of those future difficulties; the price of real estate appears to be more a function of the health of the local economy than a reflection of the level of property taxes imposed to finance municipal improvements. In any event, we are not convinced that the risk of future economic collapse that might result in bond obligations becoming an unshiftable, unsharable burden on property owners is sufficiently real or substantial to justify denying the vote in a current bond election to all those nonproperty owners who have a significant interest in the facilities to be financed, who are now indirectly sharing the property tax burden, and who will be paying other taxes used by the municipality to service its general obligation bonds.

We thus conclude that, although owners of real property have interests somewhat different from the interests of nonproperty owners in the issuance of general obligation bonds, there is no basis for concluding that nonproperty owners are substantially less interested in the issuance of these securities than are property owners. That there is no adequate reason to restrict the franchise on the issuance of general obligation bonds to property owners is further evidenced by the fact that only 14

States now restrict the franchise in this way;[11] most States find it possible to protect property owners from excessive property tax burdens by means other than restricting the franchise to property owners. The States now allowing all qualified voters to vote in general obligation bond elections do not appear to have been significantly less successful in protecting property values and in soundly financing their municipal improvements. Nor have we been shown that the 14 States now restricting the franchise have unique problems that make it necessary to limit the vote to property owners. We must therefore affirm the District Court's declaratory judgment that the challenged provisions of the Arizona Constitution and statutes, as applied to exclude nonproperty owners from elections for the approval of the issuance of general obligation bonds, violate the Equal Protection Clause of the United States Constitution.

## II

In view of the fact that over the years many general obligation bonds have been issued on the good-faith assumption that restriction of the franchise in bond elections was not prohibited by the Federal Constitution,

---

[11] It appears from the briefs filed in this case that 13 States besides Arizona restrict the franchise to property owners or property taxpayers in some or all general obligation bond elections:

Alaska (Alaska Stat. § 07.30.010 (b) (Supp. 1969)); Colorado (Colo. Const., Art XI, §§ 6, 7, and 8); Florida (Fla. Const., Art. 7, § 12); Idaho (Idaho Code Ann. § 31–1905 (1963), § 33–404 (Supp. 1969), § 50–1026 (1967)); Louisiana (La. Const., Art. 14, § 14 (a)); Michigan (Mich. Const., Art. II, § 6); Montana (Mont. Const., Art. IX, § 2, Art. XIII, § 5; Mont. Rev. Codes Ann. § 11–2310 (1968), § 75–3912 (1962)); New Mexico (N. M. Const., Art. IX, §§ 10, 11, and 12); New York (N. Y. Town Law § 84 (1965); N. Y. Village Law § 4–402 (1966)); Oklahoma (Okla. Const., Art. X, § 27); Rhode Island (R. I. Const. amdt. 29, § 2); Texas (Tex. Const., Art. 6, § 3a); Utah (Utah Const., Art. XIV, § 3).

it would be unjustifiably disruptive to give our decision in this case full retroactive effect. We therefore adopt a rule similar to that employed with respect to the applicability of the *Cipriano* decision: our decision in this case will apply only to authorizations for general obligation bonds that are not final as of June 23, 1970, the date of this decision. In the case of States authorizing challenges to bond elections within a definite period, all elections held prior to the date of this decision will not be affected by this decision unless a challenge on the grounds sustained by this decision has been or is brought within the period specified by state law. In the case of States, including apparently Arizona,[12] that do not have a well-defined period for bringing challenges to bond elections, all elections held prior to the date of this decision that have not yet been challenged on the grounds sustained in this decision prior to the date of this decision will not be open to challenge on the basis of our ruling in this case. In addition, in States with no definite challenge period, the validity of general obligation bonds that have been issued before this decision and prior to the commencement of an action challenging the issuance on the grounds sustained by this decision will not be affected by the decision in this case. Since appellee in this case brought her constitutional challenge to the Phoenix election prior to the date of our decision in this case and no bonds have been issued pursuant to

---

[12] Ariz. Rev. Stat. Ann. § 16–1202 (Supp. 1969) and § 16–1204 (1956) provide that election contest suits generally must be brought by "electors" within five days after completion of the canvass and declaration of the result of an election. Under the Arizona Supreme Court's decision in *Morgan* v. *Board of Supervisors,* 67 Ariz. 133, 192 P. 2d 236 (1948), it is unclear whether suits brought after the expiration of the five-day period to challenge a bond election on constitutional grounds would in all cases be barred. The District Court found there was no bar to suit in this case.

that election, our decision applies to the election involved in this case. The District Court was therefore correct in holding that the June 10, 1969, bond election in Phoenix was constitutionally invalid and in enjoining the issuance of bonds pursuant to the approval obtained in that election.

*Affirmed.*

MR. JUSTICE BLACK concurs in the judgment and in Part I of the opinion of the Court.

MR. JUSTICE BLACKMUN took no part in the consideration or decision of this case.

MR. JUSTICE STEWART, whom THE CHIEF JUSTICE and MR. JUSTICE HARLAN join, dissenting.

If this case really involved an "election," that is, a choice by popular vote of candidates for public office under a system of representative democracy, then our frame of reference would necessarily have to be *Reynolds* v. *Sims*, 377 U. S. 533, and its progeny. For, rightly or wrongly, the Court has said that in cases where public officials with legislative or other governmental power are to be elected by the people, the Constitution requires that the electoral franchise must generally reflect a regime of political suffrage based upon "one man, one vote." Recent examples of that constitutional doctrine are the Court's decisions in *Kramer* v. *Union Free School District,* 395 U. S. 621, involving the franchise to vote for the members of a school board; and *Hadley* v. *Junior College District,* 397 U. S. 50, involving the apportionment of voting districts for the election of the trustees of a state junior college.

Whether or not one accepts the constitutional doctrine embodied in those decisions, they are of little relevance here. For in this case nobody has claimed that the

members of the City Council of Phoenix, Arizona—the individual appellants here—were elected in any way other than on a one man, one vote basis, or that they do not fully and fairly represent the entire electorate of the municipality. And it was these councilmen who initiated the program for borrowing money so that the city might have a sewer system, parks and playgrounds, police and public safety buildings, a new library, and other municipal improvements. Having made that initial decision, the councilmen submitted the borrowing and construction program for final approval by those upon whom the burden of the municipal bonded indebtedness would legally fall—the property owners of the city. These property owners *approved* the entire program by a majority vote. Yet the Court today says the Equal Protection Clause prevents the city of Phoenix from borrowing the money to build the public improvements that the council and the property owners of the city have both approved. I cannot believe that the United States Constitution lays such a heavy hand upon the initiative and independence of Phoenix, Arizona, or any other city in our Nation.

In *Cipriano* v. *City of Houma,* 395 U. S. 701, the Court held unconstitutional a Louisiana law that permitted only property owners to vote on the question of approving bonds that were to be financed exclusively from the revenues of municipally operated public utilities. I agreed with that decision, because the State had created a wholly irrelevant voting classification. *Id.,* at 707 (BLACK and STEWART, JJ., concurring in the judgment). As the Court there noted:

> "The revenue bonds are to be paid only from the operations of the utilities; they are not financed in any way by property tax revenue. Property owners, like nonproperty owners, use the utilities and pay the rates; however, the impact of the revenue

bond issue on them is unconnected to their status as property taxpayers. Indeed, the benefits and burdens of the bond issue fall indiscriminately on property owner and nonproperty owner alike." *Id.,* at 705.

The case before us bears only a superficial resemblance to *Cipriano,* for we deal here, not with income-producing utilities that can pay for themselves, but with municipal improvements that must be paid for by the taxpayers. Under Arizona law a city's general bonded indebtedness effectively operates as a lien on all taxable real estate located within the city's borders. During the entire life of the bonds the privately owned real property in the city is burdened by the city's pledge—and statutory obligation—to use its real estate taxing power for the purpose of repaying both interest and principal under the bond obligation.[1] Whether under these circumstances Arizona could constitutionally confer upon its municipal governing bodies exclusive and absolute power

---

[1] Ariz. Rev. Stat. Ann. § 35–458 provides: "After the bonds are issued, the governing body or board . . . shall annually levy and cause to be collected a tax . . . upon all taxable property in such political subdivision, sufficient to pay the interest on the bonds when due, and . . . to redeem the bonds when they mature."

In *Allison* v. *City of Phoenix,* 44 Ariz. 66, 33 P. 2d 927 (1934), the Arizona Supreme Court held that if a city has money available from another source "it may from time to time be transferred to the interest and redemption funds created by the statute. . . ." 44 Ariz., at 77, 33 P. 2d, at 931. The court made clear, however, that the predecessor of Ariz. Rev. Stat. Ann. § 35–458 "is mandatory and binding upon all parties mentioned therein, and that they must levy and cause to be collected a tax for the payment of bonds issued under such article, in the manner provided by such section." *Id.,* at 74, 33 P. 2d, at 930. The use of excise taxes to repay general obligation bonds is thus optional, but the imposition of *ad valorem* taxes for these purposes is mandatory.

Taxes imposed on real property in Arizona become a lien on that property. Ariz. Rev. Stat. Ann. § 42–312.

to incur general bonded indebtedness without limit at the expense of real property owners is a question that is not before us. For the State has chosen a different policy, reflected in both its constitutional and statutory law.[2] It has told the governing bodies of its cities that while they are free to plan and propose capital improvements, general obligation bonds cannot be validly issued to finance them without the approval of a majority of those upon whom the weight of repaying those bonds will legally fall.

This is not the invidious discrimination that the Equal Protection Clause condemns, but an entirely rational public policy. I would reverse the judgment, because I cannot hold that the Constitution denies the City of Phoenix the public improvements that its Council and its taxpayers have endorsed.[3]

---

[2] The constitutional and statutory provisions applicable to all bond authorization elections of incorporated cities and towns in the State of Arizona limit the right to vote in such elections to persons who are qualified electors and who are also real property taxpayers. Ariz. Const., Art. 7, § 13; Art. 9, § 8. Ariz. Rev. Stat. Ann. § 9-523 and § 35-455. These constitutional and statutory provisions apply to all political subdivisions within the State of Arizona, and not just to cities and towns.

[3] Since the Court's contrary view today prevails, I add that upon that premise THE CHIEF JUSTICE and I agree with Part II of the Court's opinion, and that MR. JUSTICE HARLAN also joins in Part II of the Court's opinion, subject, however, to the views expressed in his concurring opinion in United States v. Estate of Donnelly, 397 U. S. 286, 295 (1970).