Bruce JONES, Appellant–Plaintiff,

v.

Martha WOMACKS, in her official capacity as Marion County Auditor, Appellee–Defendant.

No. 49A02–0509–CV–853.

Court of Appeals of Indiana.

Aug. 24, 2006.

Kenneth J. Falk, American Civil Liberties Union of Indiana, Indianapolis, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, David L. Steiner, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

**OPINION**

SULLIVAN, Judge.

Appellant, Bruce Jones, brought suit against Appellee, Martha Womacks in her capacity as Marion County Auditor, claiming that Indiana Code § 6–1.1–20–3.2 (Burns Code Ed. Supp.2005), which governs petition and remonstrance procedures for building projects proposed by political subdivisions, was unconstitutional. The trial court ultimately granted summary judgment in favor of Womacks. Upon appeal, Jones claims that the trial court erred in granting summary judgment, arguing both that the current case is not moot and that the statute at issue violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution in that it restricts the right to participate in the petition/remonstrance process to owners of real property living within the political subdivision.

The State[1] agrees with Jones's statement of the facts, which reveal that the Indianapolis Public Schools ("IPS") has a plan, known as the Capital Improvement Program, to renovate, expand, and remodel its existing school facilities. The plan is estimated to cost in excess of $800 million. The plan will be funded by IPS incurring property tax-backed debt. IPS is proceeding with the plan in stages, with $250 million in debt having already been incurred and IPS taking steps to raise $200 million more. It is the process of raising

---

1. The State has intervened as an Appellee and argues only that the case is moot. Womacks, though filing an appearance, has declined to file an appellate brief.

this latter $200 million which is at issue in the present case.

Because IPS was planning to incur debt, notice was sent pursuant to Indiana Code § 6–1.1–20–3.1 (Burns Code Ed. Supp. 2005). Section 3.1 states that a political subdivision, such as IPS, may not impose property taxes to pay debt service or lease rentals without completing several procedures, among which is that a notice be published,[2] which "must include the following information:

\* \* \*

(E) A statement that any owners of real property within the political subdivision who want to initiate a petition and remonstrance process against the proposed debt service or lease payments must file a petition that complies with subdivisions (4) and (5) not later than thirty (30) days after publication in accordance with IC 5–3–1." I.C. § 6–1.1–20–3.1(3).

After giving the appropriate notice, a "petition requesting the application of a petition and remonstrance process may be filed by the lesser of . . . one hundred (100) owners of real property within the political subdivision" or "five percent (5%) of the owners of real property within the political subdivision." I.C. § 6–1.1–20–3.1(4). The carriers and signers of the petition forms (which are designed by the state board of accounts and sent to the county auditor) "must be owners of real property" and the carrier "must be a signatory on at least one (1) petition." I.C. § 6–1.1–20–3.1(5). The petition(s) must be filed with the county auditor not more than thirty days after the original notice was given. I.C. § 6–1.1–20–3.1(7). Thereafter, the county auditor must file a certificate and each petition with either the township trustee (if the political subdivision is a

township) who shall then present the petition(s) to the township board, or (if the political subdivision is not a township) the body that has the authority to issue the bonds. This filing of the certificate must occur within fifteen business days of the filing of the petition requesting a petition and remonstrance process, and the certificate must state the number of petitioners who are owners of real property in the political subdivision. I.C. § 6–1.1–20–3.1(8)(A) and (B). If a sufficient petition requesting a petition and remonstrance process is not filed by owners of real property, the political subdivision may issue bonds or enter into a lease. I.C. § 6–1.1–20–3.1(8).

In the present case, owners of real property in the IPS school district timely filed the sufficient number of signatures pursuant to Section 3.1 to initiate a petition and remonstrance process. Where a sufficient "initiation" petition requesting a petition and remonstrance process has been filed, a political subdivision, such as IPS, may not impose property taxes to pay debt service or lease rentals without meeting the procedures set forth in I.C. § 6–1.1–20–3.2.

Pursuant to Section 3.2, the political subdivision must give notice by publication and first-class mail which includes a statement that owners of real property in the subdivision who want to either petition in favor of or remonstrate against the proposed debt must file the respective petitions or remonstrances not earlier than thirty days nor later than sixty days after the publication of the notice. I.C. § 6–1.1–20–3.2(1).

Section 3.2 then provides that:

"(2) *Not earlier than thirty (30) days or later than sixty (60) days after the notice under subdivision (1) is given:*

---

**2.** Notice must also be mailed to any organization which has filed an annual written request

for such notice.

(A) petitions (described in subdivision (3)) in favor of the bonds or lease; and

(B) remonstrances (described in subdivision (3)) against the bonds or lease;

may be filed by an owner or owners of real property within the political subdivision. Each signature on a petition must be dated and the date of signature may not be before the date on which the petition and remonstrance forms may be issued under subdivision (3). A petition described in clause (A) or a remonstrance described in clause (B) must be verified in compliance with subdivision (4) before the petition or remonstrance is filed with the county auditor under subdivision (4)." (emphasis supplied).

Similar to the initiation process under Section 3.1, the county auditor must provide the petition or remonstrance forms (designed by the state board of accounts) to owners of real property who request such forms. I.C. § 6–1.1–20–3.2(3). The forms must come with instructions that explain certain requirements, which include that "the carrier and signers must be owners of real property." I.C. § 6–1.1–20–3.2(3)(A).

The petitions and remonstrances must then be verified and filed with the county auditor within the sixty-day period earlier mentioned. I.C. § 6–1.1–20–3.2(4). Within fifteen days, the auditor must then file a certificate and the petitions/remonstrances with the body of the political subdivision charged with issuing the bonds. I.C. § 6–1.1–20–3.2(5). The auditor may take an additional five days to review and certify the petitions/remonstrances for each additional five thousand signatures, up to a maximum of sixty days. *Id.* This certification *"must state the number of petitioners and remonstrators that are owners of real property within the political subdivision." Id.* (emphasis supplied).

If there are more owners of real property within the political subdivision who sign a remonstrance against the debt (or lease) than the number who signed a petition for the debt (or lease), the debt (or lease) may not be entered into. I.C. § 6–1.1–20–3.2(6). Further, the political subdivision may not make a preliminary determination to issue bonds or enter into a lease for the defeated project, or any other project that is not substantially different, within one year of the date of the auditor's certification. *Id.* "Withdrawal of a petition carries the same consequences as a defeat of the petition." *Id.*

In the present case, Jones limits his challenge to the requirement of ownership of real property to the petition/remonstrance contest in Section 3.2 and does not directly challenge the "initiation petition" process in Section 3.1. Jones lives within the IPS district and has two children who attend IPS schools. Although Jones is employed and pays local taxes, he does not own real property within the IPS district. Instead, Jones rents an apartment. Because Jones does not own real property within the IPS district, he is not permitted to participate in the petition/remonstrance process under Section 3.2.

On December 15, 2004, Jones filed a "Complaint for Declaratory and Injunctive Relief/Notice of Claim of Unconstitutionality of Indiana Statute" in the Marion Circuit Court. Jones also filed that day a Motion for Preliminary Injunction. The named defendant was Martha Womacks in her official capacity as Marion County Auditor. On December 22, 2004, the parties entered into and filed with the trial court a "Stipulation in Lieu of Preliminary Injunction," which reads in pertinent part as follows:

"Come now the parties, by their counsel, and stipulate and agree as follows:

1. Plaintiff has filed this action seeking, among other things, a preliminary injunction to allow him to sign either a remonstrance or petition in the ongoing petition/remonstrance procedure in the Indianapolis Public School district.

2. His participation in this procedure is barred by Indiana Code § 6–1.1–20–3.2 which restricts participation to property owners only.

3. As plaintiff has indicated by his Affidavit, he is not a property owner but asserts an interest in the procedure.

4. In lieu of a preliminary injunction hearing and ruling, the parties agree that Bruce Jones shall be allowed to sign either a petition or remonstrance which shall then be sealed and filed with this Court at some time prior to the conclusion of the procedure on, or before, December 30, 2004.

5. The parties agree that the signed petition or remonstrance shall remain sealed. In the event that the on-going petition/remonstrance procedure ends in a tie, the parties request the Court to at that point conduct a preliminary injunction or other hearing to determine if Mr. Jones['s] signature should be counted.

6. The parties agree to notify the Court within ten (10) days after the petition/remonstrance procedure has concluded and the signatures have been finally tabulated." Appendix at 16–17.

On March 22, 2005, the parties filed another stipulation with the trial court which noted that the petition/remonstrance process had been completed in January 2005 and that Womacks, as county auditor, had certified more than 4,500 valid signatures on the petitions in favor of issuing bonds, but had certified only forty valid signatures on remonstrances against issuing bonds. On April 1, 2005, Jones filed a motion for summary judgment. Womacks filed a motion for summary judgment on May 2, 2005. On August 18, 2005, the trial court entered an order denying Jones's motion for summary judgment but granting Womacks's motion. Jones filed a notice of appeal on September 12, 2005.

On November 7, 2005, the State filed a motion to intervene as a party "for the purpose of addressing a constitutional challenge to a statute, Indiana Code § 6–1.1–20–3.2[,] and request[ed] all rights attendant to the status of a party." The State's motion mentioned that the Attorney General is "charged by statute with defending the constitutionality of statutes of the State of Indiana." In support of its motion, the State cited Indiana Code § 4–6–1–6 (Burns Code Ed. Repl.2002), which provides that the Attorney General "shall represent the state in any matter involving the rights or interests of the state," and Indiana Code § 4–6–2–1 (Burns Code Ed. Repl.2002), which provides that the Attorney General "shall defend all suits brought against the state officers in their official relations, except suits brought against them by the state ... and ... shall be required to attend to the interests of the state in all suits, actions or claims in which the state is or may become interested in the Supreme Court of this state." Further cited was Indiana Code § 34–14–1–11 (Burns Code Ed. Repl.1998), which states in part, "If [a] statute, ordinance, or franchise is alleged to be unconstitutional, the attorney general of the state shall also be served with a copy of the proceeding and be entitled to be heard."

Here, however, the Attorney General's office, by its own admission, did not appear at the trial court level. Nevertheless, in its motion to intervene, the Attorney General's office stated, "Based on recent con-

tacts with counsel for Appellee Womacks ... it has been determined that the interests of the State would be best served if the State is permitted to intervene as a party on this appeal for the purpose of addressing the constitutional challenge to the statute in question." This court granted the State's motion to intervene on November 14, 2005. Also on November 14, 2005, Womacks filed an appearance but also filed a notice of intent not to file a brief because of the State's intervention in the appeal.

Interestingly, the State, after intervening upon appeal, does not argue the merits of the constitutional challenge to Section 3.2 at all, but instead argues only that the matter is moot and should not be addressed. Jones's argument is twofold: he first argues that the matter is not moot and/or that even if it is moot, it falls within an exception to the mootness doctrine; secondly, he argues that Section 3.2 is unconstitutional in that it violates the Equal Protection Clause of the Fourteenth Amendment by denying him the right to participate in what he claims amounts to an election or referendum.

## I

### Mootness

■■■ Generally, this court will not reverse a lower court's determination where absolutely no change in the status quo will result. *Francies v. Francies,* 759 N.E.2d 1106, 1111 (Ind.Ct.App.2001), *trans. denied.* Although Article III of the United States Constitution limits the jurisdiction of federal courts to actual cases and controversies, the Indiana Constitution contains no similar restraint. *In re Lawrance,* 579 N.E.2d 32, 37 (Ind.1991). Thus, although moot cases are usually dismissed, Indiana courts have long recognized that a case may be decided on its merits under an exception to the general rule when the case involves questions of "great public

interest." *Id.* Cases found to fall within this "public interest exception" typically contain issues likely to recur. *Id.* As our Supreme Court noted in *Lawrance,* earlier cases from this court had declared that an additional element was required to resolve a moot case on its merits: that the case must be likely to evade review. *Id.* at 37 n. 2. According to the court in *Lawrance,* this holding was premised upon a misreading of earlier case law, which did not include "evading review" as a requirement of deciding otherwise moot cases. *Id.* " 'Capable of repetition, yet evading review' is a federal mootness doctrine, stricter than our own, rooted in the requirement that Article III courts decide only live cases and controversies." *Id.*

Here, although Jones argues that this case is not moot, it appears to be undisputed that even if we were to reverse the trial court's grant of summary judgment, no true change in the status quo would result. The petition/remonstrance procedure at issue did not result in a tie, and Jones's signature on either a petition or remonstrance was not determinative of the debt/bond issue. In the true sense of the word, the question presented by Jones is moot. The question before this court, then, is whether this case fits within the above-mentioned public interest exception.

The State argues various reasons why this case does not fit within the public interest exception. The State claims that Jones has a "minimal, remote and speculative personal stake in the outcome of this case at this time." Appellee's Brief at 6. However, we think that the question of whether a citizen may participate in a process which directly affects the education of his children is neither minimal nor speculative. This is especially so in the present case where IPS plans to spend over $800 million on its Capital Improvement Program, but so far has incurred debt of approximately $450 million. To complete

its plan, IPS will still have to incur debt of approximately $350 million in the future. As IPS goes through the process to incur this debt, the issue of whether Jones may participate in any petition/remonstrance process will likely recur.

The State also argues that given the nature of the "stipulation" entered into by the parties, whereby Jones was allowed to sign a petition or remonstrance which was to be sealed and filed with the trial court, Jones effectively was allowed to participate. The State notes that the signatures on the petitions in favor of the IPS bond proposal overwhelmingly outnumbered the signatures on the remonstrances against the bond issuance. Although this argument has some facial appeal, we nevertheless disagree. The fact remains that Jones was not allowed to actually participate in the process. The issue is not whether Jones, or others who do not own real property, have a right to be the determinative factor in the process; the issue is whether they have a right to participate in the process and have their signatures counted. As discussed in more detail *infra*, the right at issue is the right to participate. Indeed, assuming momentarily that the petition/remonstrance process is an "election," what Jones was allowed to do by filing his sealed signature with the trial court was akin to filing a provisional ballot. Were the legislature to pass a statute requiring a certain subset of voters to cast provisional ballots which would be counted only if the election results could be changed by the counting of such provisional ballots, the fact that the election was not close enough to be changed by the provisional ballots would not alter that the voters in the subset were denied their right to actually participate in the election. The same holds true here in that Jones seeks the right to participate, not change the ultimate result.

The State also claims that because Womacks has declined to actively participate in this appeal, there is "no reason to question whether state auditors have any particularized interest in defending the constitutionality of [Section 3.2]." Appellee's Br. at 6. The State's argument in this regard is that the school corporation is the party who would have a real interest in defending Section 3.2, not a county auditor. In a related vein, the State argues that "although the Indiana Attorney General has been given discretionary authority to defend state statutes, and the Attorney General has intervened in this appeal, advocacy by the Attorney General alone may not always result in a full exploration of the consequences and factors important to deciding whether a statute is constitutional." Appellee's Br. at 7. The State points out that the Attorney General did not participate at the trial level in this case and that it would be better to "defer consideration of the moot question to another case, where the defendant might be a party that would be directly affected by a declaration that the statute is unconstitutional...." Appellee's Br. at 7. We point out, however, that the office of the Attorney General admittedly declined to participate at the trial court level, and we are not inclined to now use this as a reason why this court should not address the merits of the present case.[3] Similarly, that the Attorney General made a "litigation decision" to argue only the issue of mootness cannot be used as a reason why this court should not address the merits of what has all indications of being an issue of great public importance. The same holds true for Womacks's decision to not file a brief upon appeal.

---

**3.** If the State had participated in the proceedings before the trial court, perhaps it could have moved to join those parties it now claims have a more compelling interest in this case. See Ind. Trial Rule 19.

The State also claims that by dismissing the present case as moot, it would permit resolution of this question in a non-moot case, suggesting that the entire litigation process, including an appeal, could be completed in the 90 to 115 days provided by statute for the petition/remonstrance process to take place. Jones, on the other hand, argues that it would be impractical, if not impossible, to resolve any future litigation in such a short period. We agree with Jones. The question of the constitutionality of Section 3.2 could continually evade review[4] given the short amount of time available to those who would challenge the petition/remonstrance process.

The only Indiana case directly on point which is referred to by the parties is *Ray v. State Election Board,* 422 N.E.2d 714 (Ind.Ct.App.1981), *clarified upon reh'g,* 425 N.E.2d 240, in which the appellant Ray had attempted to have his name placed on the ballots of both the Republican and Democratic parties as a candidate for Congress. When the State Election Board denied Ray a spot on either ballot, he appealed to the Marion Superior Court, which affirmed the board's decision. Upon appeal, the first issue before the court was whether the case was moot. The entirety of the court's discussion of this issue follows:

> "Time has obviously made this case moot. The 1980 primary has been concluded and no decision we make today can turn the clock back. Nonetheless, due to the timing involved in our state election laws, we find several issues raised by Ray 'capable of repetition, yet evading review,' *Rosario v. Rockefeller,* (1973) 410 U.S. 752, 757 footnote 5, 93 S.Ct. 1245, 1249, 36 L.Ed.2d 1, and of general public interest and we will therefore address these issues." *Ray,* 422 N.E.2d at 716 (footnote omitted).

Although using the stricter federal standard of "capable of repetition, yet evading review," the *Ray* court nevertheless addressed the issue. Thus, even under the stricter federal standard, this court has addressed election-based issues in the past. Using the more lenient Indiana standard, we come to the same conclusion here. The constitutionality of the petition/remonstrance process is an issue of great public importance, and failure to address this claim on the merits might lead to further potential disenfranchisement of those who do not own real property, leaving such individuals with little or no chance of fully litigating their claims.[5]

---

4. We understand that "capable of evading review" is not a requirement of Indiana's public interest exception to the mootness doctrine. *Lawrance,* 579 N.E.2d at 37. The fact that this issue could evade review, however, is further support for a decision to address what would otherwise be a moot question.

5. In addition to *Ray,* independent research has revealed another case involving an election in which the court determined that the case before it, although claimed to be moot, deserved consideration. In *Kensinger v. Schaal,* 200 Ind. 275, 161 N.E. 262 (1928), the court addressed the defendant's election contest and complaint for the salary, fees, and emoluments for a judicial office he claimed was improperly denied him. The court held that, although there could be no change in who held the office after the term thereof had expired, "we do not undertake to say that a final judicial determination of the question of which candidate for public office received the most legal votes is not a matter of great public interest." 200 Ind. at 282, 161 N.E. at 263. The court then wrote:

> "It would be manifestly unjust if appellant, after receiving a judgment of the board of county commissioners declaring him elected to office and after having a bond executed in his favor by appellee conditioned upon the due prosecution of an appeal from that judgment, could be deprived of all his rights, political and financial, under that judgment and be required to pay all the costs, merely because the wheels of justice ground so slowly that the term of office expired before there was a final adjudica-

Our research has revealed numerous cases in which challenges were brought regarding elections, but Indiana appellate courts dismissed the cases as moot where the elections had been completed before the appellate cases were decided.[6] Several

tion on the merits in the appellate tribunal." *Id.*

In the present case Jones is not seeking office, nor is he seeking the financial rights to an office. Still, we find the *Kensinger* court's language regarding the slowness of the judicial process appropriate. Jones, or others like him, should not have to risk being denied a right to participate in the process simply because they might not be able to litigate the issue in the short amount of time available.

**6.** *See State ex rel. Angelicchio v. Ind. State Election Bd.*, 251 Ind. 525, 242 N.E.2d 635 (1968) (where relator sought writ of mandate to compel defendants to place his name on ballot for general election and where general election had already been held by time of court's decision, the court dismissed the appeal as moot); *State ex rel. Pruitt v. Lake Circuit Court*, 245 Ind. 612, 201 N.E.2d 332 (1964) (where relator sought writ of mandate to order that his name be included on primary ballot and where the primary election had passed before the case could be put at issue, the court dismissed the cause as moot); *State ex rel. Kuester v. Superior Court of Vanderburgh County*, 243 Ind. 114, 183 N.E.2d 205 (1962) (where relators were defendants in an action for a temporary restraining order staying the holding of a special election regarding a proposed school reorganization plan and where the plan had since been defeated at the ballot, appeal was dismissed as moot); *State ex rel. Eleventh Dist. Republican Cent. Comm. v. Circuit Court of Marion County*, 240 Ind. 581, 167 N.E.2d 468 (1960) (cause dismissed as moot where relator sought writ of mandate and prohibition restraining the use of a slate of names of candidates on the primary election where primary election had already occurred); *Cox v. State ex rel. Bayt*, 240 Ind. 359, 165 N.E.2d 140 (1960) (where appellant brought mandamus action to compel appointment of his nominee to election board and where general election had occurred and term of office would have expired before general election, court dismissed appeal as moot and declined to apply public interest exception); *State ex rel. Makowski v. Grandys*, 236 Ind. 367, 139 N.E.2d 436 (1957) (where relator sought mandate to include his name on primary ballot as a candidate for several offices and where election had occurred by the time of the appeal, court dismissed appeal as moot and declined to apply public interest exception); *State ex rel. Murchie v. Bath*, 227 Ind. 481, 86 N.E.2d 680 (1949) (where relator brought action to mandate that his name be placed on primary ballot and later general ballot and where, by the time of the appeal, the general election had occurred, the appeal was dismissed as moot); *State ex rel. Thompson v. Wheaton*, 193 Ind. 30, 138 N.E. 820 (1923) (appeal dismissed as moot in case where relator brought mandamus action to compel board of election commissioners to place names of six candidates on ballot for office of justice of the peace but where the election had been held months before, within fourteen days after appeal was perfected); *State ex rel. Bryant v. Jackson*, 192 Ind. 497, 137 N.E. 51 (1922) (where relator brought action for mandate to require appellee to certify his name as a candidate for judge in primary election but time for holding primary election had passed before appeal was taken, a decision favoring relator could not benefit him, and appeal was dismissed as moot); *State ex rel. Williamson v. Bd. of Primary Election Comm'rs of Madison County*, 185 Ind. 238, 113 N.E. 754 (1916) (where appellees rejected relator's demand that his name be placed on primary ballot, relator filed complaint for mandamus which trial court refused, relator appealed, but appeal was dismissed as moot where the primary election had been held before the appeal was submitted to court); *Howard v. Happell*, 181 Ind. 165, 103 N.E. 1065 (1914) (dismissing appeal as moot where appellants had complied with mandate of trial court to certify appellee's name as the nominee for the office in question and to restrain appellants from certifying name of appellee's opponent because court's decision would not affect the parties or serve any useful purpose); *Krochta v. State*, 175 Ind.App. 436, 372 N.E.2d 475 (1978) (where action was brought to compel county officers to hold election pursuant to statute which required officers to redistrict county and hold election but where the disputed election had since been held, the court dismissed the appeal as moot and declined to apply the public interest exception); *Knox Cmty. Sch. Corp. v. McCurdy*, 174 Ind. App. 347, 367 N.E.2d 1108 (1977) (in challenge to school board's refusal to act on a voter-initiated plan to reorganize school cor-

of these cases involved mandamus actions where a potential candidate claimed that his name should have been included upon the ballot, but before the courts could address the matter, the elections had taken place, and the appeals were dismissed as moot.

In those cases, however, the chance that that particular issue—whether a particular candidate deserved to be on a particular ballot—was unlikely to repeat, and addressing the merits even under a public interest exception would have been of little use. Here, however, the issue before us—whether those who do not own real property may participate in the petition/remonstrance process—is of a great public importance, and we exercise our discretion to address Jones's appeal upon the merits.

## II

### Equal Protection

■ The brunt of Jones's claim is that Section 3.2 violates the Equal Protection Clause of the Fourteenth Amendment in that it denies those such as Jones the opportunity to participate in the petition/remonstrance process because they do not own real property within the political subdivision. In order to prevail, Jones claims that the petition/remonstrance process set forth in Section 3.2 is an "election," because the United States Supreme Court has held that states may not limit the right to participate in elections without a compelling reason.

In *Kramer v. Union Free School District No. 15*, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969), the High Court addressed a New York statute which restricted the ability to vote in a school district election to those otherwise eligible voters who either owned or leased taxable real property in the district or who had children or wards enrolled in the local public schools. The plaintiff, a bachelor who neither owned nor leased real property and who had no children or wards attending local schools, filed suit in the district court claiming that the statute denied him equal protection of the law. The Court in *Kramer* held that if a challenged statute grants the right to vote in a limited-purpose election to some otherwise qualified voters and denies it to others, courts must determine whether the exclusions are necessary to promote a compelling state interest. *Id.* at 627, 89 S.Ct. 1886. Nothing less than a showing that the exclusions are necessary to promote a compelling state interest is required, and the state may not justify the exclusions simply because the questions scheduled for the election need not have been submitted to the voters. *Id.* at 629, 89 S.Ct. 1886. The Court determined that the requirements of the New York statute at issue were not sufficiently tailored to limiting the franchise to those primarily interested in school affairs to justify denial of the franchise to the plaintiff. *Id.* at 633, 89 S.Ct. 1886.

The same day that the Court decided *Kramer*, it also decided *Cipriano v. City of Houma*, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969). At issue in that case were provisions of Louisiana law which gave only property-taxpayers the right to vote in elections called to approve the issuance of revenue bonds by a municipality. The plaintiff sought to enjoin the issuance of bonds, which the defendant city planned

poration, the court dismissed the appeal as moot where, while the appeal was pending, a special election was conducted pursuant to statute and the reorganization plan was overwhelmingly approved); *In re Mayoralty Election of City of New Castle*, 50 Ind.App. 35, 97

N.E. 1020 (1912) (dismissing as moot appeal where appellant was challenging election of appellee as mayor of city because, during pendency of appeal, appellee resigned from office and appellant thereafter was elected mayor).

to use to extend and improve the city-owned utility system, and sought to obtain a declaratory judgment that the law was unconstitutional. The city claimed that property owners had a special pecuniary interest in the election because the efficiency of the utility system directly affected property and property values. The Court rejected this argument, stating that the city utility system affected virtually every resident, not just property owners. *Id.* at 705, 89 S.Ct. 1897. The Court further observed that the bonds were to be paid only from operation of the utility system and were not financed in any way by property-tax revenues. *Id.* The Court concluded:

> "When, as in this case, the State's sole justification for the statute is that the classification provides a 'rational basis' for limiting the franchise to those voters with a 'special interest,' the statute clearly does not meet the 'exacting standards of precision we require of statutes which selectively distribute the franchise.'" *Id.* at 706, 89 S.Ct. 1897 (quoting *Kramer,* 395 U.S. at 632, 89 S.Ct. 1886).

The following year, in *Hadley v. Junior College Dist. of Metropolitan Kansas City,* 397 U.S. 50, 56, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970), the Court held broadly that:

> "as a general rule, whenever a state or local government decides to select persons by popular election to perform governmental functions, the Equal Protection Clause of the Fourteenth Amendment requires that each qualified voter must be given an equal opportunity to participate in that election, and when members of an elected body are chosen from separate districts, each district must be established on a basis that will insure, as far as is practicable, that equal numbers of voters can vote for proportionally equal numbers of officials."

Shortly thereafter, in *City of Phoenix v. Kolodziejski,* 399 U.S. 204, 205, 90 S.Ct. 1990, 26 L.Ed.2d 523 (1970), the Court resolved the question it had left unanswered in *Cipriano:* "[d]oes the Federal Constitution permit a State to restrict to real property taxpayers the vote in elections to approve the issuance of general obligation bonds?" The Court answered in the negative. Similar to its reasoning in *Cipriano,* the Court noted that all residents of the city of Phoenix had a substantial interest in the public facilities and the services available in the city which would be affected by the outcome of the bond election at issue. *Id.* at 209, 90 S.Ct. 1990. "Presumptively, when all citizens are affected in important ways by a governmental decision subject to a referendum, the Constitution does not permit weighted voting or the exclusion of otherwise qualified citizens from the franchise." *Id.* Further, although Arizona law called for the levy of taxes on real property to service the bonds, other revenues were legally available for such a purpose. *Id.* The Court noted, however, that although the justification for restricting the franchise to property owners would seem to be the strongest where the municipality looks only to property tax revenues to service the general obligation bond, even that justification would be insufficient to support restricting the franchise. *Id.* at 210, 90 S.Ct. 1990. This was so, the Court stated, because property taxes, although initially paid by property owners, would affect tenants who would ultimately bear the burden of tax increases which would likely be passed in whole or in part on to them by landlords via increases in rent. *Id.* Taxes on commercial property could also be passed on to customers by increased prices. *Id.* The Court concluded that "although owners of real property have interests somewhat different from the interests of non-property owners in the issuance of general

obligation bonds, there is no basis for concluding that nonproperty owners are substantially less interested in the issuance of these securities than are property owners." *Id.* at 212, 90 S.Ct. 1990.

The seemingly expansive scope of these holdings was limited somewhat by the Court's decision in *Salyer Land Co. v. Tulare Lake Basin Water Storage District,* 410 U.S. 719, 93 S.Ct. 1224, 35 L.Ed.2d 659 (1973). In that case, a California statute limited voting for the board of directors of a water storage district to only landowners and apportioned the votes according to the assessed value of the land. In distinguishing its prior cases, the Court noted that in *Hadley, supra,* it had specifically stated:

> " 'It is of course possible that there might be some case in which a State elects certain functionaries whose duties are so far removed from normal governmental activities and so disproportionately affect different groups that a popular election in compliance with *Reynolds* [*v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) ], might not be required, but certainly we see nothing in the present case that indicates that the activities of these trustees fit in that category. Education has traditionally been a vital governmental function and these trustees, whose election the State has opened to all qualified voters, are governmental officials in every relevant sense of that term.' " *Salyer Land Co.,* 410 U.S. at 727–28, 93 S.Ct. 1224 (quoting *Hadley,* 397 U.S. at 56, 90 S.Ct. 791).

The Court held that the water storage district, by reason of its special limited purpose and of the disproportionate effect of its activities on landowners as a group, was the sort of exception to the rule in *Reynolds* contemplated by *Hadley.*[7] *Sal-*

*yer Land Co.,* 410 U.S. at 730–31, 93 S.Ct. 1224. In concluding that the water storage district was not subject to the one-man, one-vote requirements, the Court specifically stated that the district, "provide[d] no other general public services such as *schools,* housing, transportation, utilities, roads, or anything else of the type ordinarily financed by a municipal body." *Id.* at 728–29, 93 S.Ct. 1224 (emphasis supplied).

Although some lower courts had narrowly interpreted the holding in *Salyer Land Co.,* in *Ball v. James,* 451 U.S. 355, 101 S.Ct. 1811, 68 L.Ed.2d 150 (1981), the Court expanded upon the holding in *Salyer Land Co.* In *Ball,* at issue was the method of electing the directors of a water reclamation district in Arizona. The election method limited voting eligibility to landowners and apportioned voting power according to the amount of land a voter owned. Although the district was a generator of hydroelectric power, supplying virtually half of the state with power and delivering approximately forty percent of its water to urban areas for non-agricultural use, the Court nevertheless held that the "constitutionally relevant" fact was that all of the water delivered by the district, like the water delivered in *Salyer Land Co.,* was distributed according to land ownership. *Ball,* 451 U.S. at 367–68, 101 S.Ct. 1811. Further, the district could not control the use to which the landowners who were entitled to the water chose to put it. *Id.* As noted by the court in *Esler v. Walters,* 56 N.Y.2d 306, 452 N.Y.S.2d 333, 437 N.E.2d 1090, 1093 (1982):

> "Thus, noting that the district's primary and originating function was simply to store and deliver water to landowners

---

7. The Court went on to address the appellants' claims under "rational basis" review, and unsurprisingly found the California stat-

ute to pass constitutional muster under this lenient standard.

who were the only residents subject to liens, taxes and other costs of the district, the court held that 'the peculiarly narrow function of this local governmental body and the special relationship of one class of citizens [landowners] to that body releases it from the strict demands of the one-person, one-vote principle of the * * * Fourteenth Amendment.'" (quoting *Ball*, 451 U.S. at 357, 101 S.Ct. 1811).

■ Several ideas can be gleaned from these cases. Among them are that States, if they grant the right to vote for such, may not restrict the right to vote in school board elections to property owners without a compelling state interest. *See Kramer*, 395 U.S. at 633, 89 S.Ct. 1886. Further, States may not restrict the right to vote in elections for approval of revenue bonds to finance utilities, *Cipriano*, 395 U.S. at 705–06, 89 S.Ct. 1897, or in elections for approval of general obligation bonds. *Kolodziejski*, 399 U.S. at 212, 90 S.Ct. 1990. And although a state may limit the right to vote to landowners in elections for the board of a water conservation district as in *Salyer Land Co.* and *Ball* because such districts do not possess the authority of a governmental unit, the Court noted in *Salyer Land Co.* that "schools" are among the services ordinarily financed by governmental units. *See Salyer*, 410 U.S. at 728–29, 93 S.Ct. 1224.

Although because it has declined to address the merits of Jones's equal protection claims, it is impossible to tell whether the State agrees with these propositions, it is clear that the question before us is whether the petition/remonstrance procedure laid out in Section 3.2 amounts to an "election" subject to these holdings of the U.S. Supreme Court. Jones, of course, argues that the petition/remonstrance process clearly is an election. The largest hurdle for Jones's position is the holding of the Indiana Supreme Court in *Forks v.*

*City of Warsaw*, 257 Ind. 237, 273 N.E.2d 856 (1971), *cert. denied*, 409 U.S. 841, 93 S.Ct. 39, 34 L.Ed.2d 80 (1972).

In *Forks*, the city had passed an ordinance purporting to annex certain land. The court noted that the General Assembly had the power to authorize the extension of the boundaries of a municipal corporation and that an individual property owner does not have a vested interest in the maintenance of such boundaries. 257 Ind. at 239, 273 N.E.2d at 858. The General Assembly, the court observed, had opted to give a statutory right of "remonstrance" to owners of land located within the area sought to be annexed. *Id.* Among the questions before the court was the appellant's contention that "the remonstrance provided for in the statute is an election for a special purpose and as such denies the appellants, who are registered voters, equal protection of the law." 257 Ind. at 241, 273 N.E.2d at 859. The court disagreed with this, stating broadly:

"A remonstrance is not an election in any sense of the word. Appellants quote from 25 Am.Jur.2d, *Elections*, § 1, page 691, as follows:

'An election may be broadly defined as the expression of a choice by the voters of a body politic, or as the means by which a choice is made by the electors. In a more restricted sense, an election is a choosing or selection, by those having a right to participate, of persons to fill public offices or of public measures which shall be adopted or rejected.'

Burns Ind.Stat., 1970 Supp., § 29–2802 defines election as follows:

'"Election." The word "elections" ["election"] shall mean and include any election at which the electors of the state or of any sub-division thereof nominate or choose by ballot public officials or decide any public question lawfully submitted to them.'

The definitions above quoted are broad enough to cover both the choice of individuals to hold public office and the submission of a public question for referendum. The Indiana Legislature might well have provided for a referendum on questions of annexation; however, this they did not choose to do. In a referendum, the question is submitted to the entire voting public for a choice. The purpose of a remonstrance is to afford the opportunity to any person seeking to object to the proposed action of a body politic by taking the affirmative step to register their objection. We, therefore, hold *that the right to remonstrate as provided by the statute in question is not an election to the extent that all voters in the community must be afforded the opportunity to participate*." 257 Ind. at 241–42, 273 N.E.2d at 859 (emphasis supplied).

At first blush, this holding would seem to doom Jones's argument that the petition/remonstrance process set forth by Section 3.2 is in fact an "election" subject to the dictates of equal protection jurisprudence. Jones accepts the holding in *Forks* as far as it applies to the facts which were present in that case, but he claims that the petition/remonstrance process under Section 3.2 is not the same as the remonstrance process at issue in *Forks*, and to

which the holding of the court was limited. *See id.*

The statute in question in *Forks* was Burns' § 48–702 (Repl.1963), which provided for a "remonstrance" process for landowners in areas annexed by ordinance into a city. The statute provided that an "appeal" could be taken from such annexation by "either a majority of the owners of land in the territory or by the owners of more than seventy-five percent [75%] in assessed valuation of the real estate in the territory" if they objected to the annexation. *Id.* The trial court then was required to hold a hearing on the matter within sixty days. *Id.* The court was to hear and determine the "appeal" and to "without delay, give judgment upon the question of such annexation according to the evidence which either party m[ight] introduce." *Id.* The trial court was to consider six conditions as the "primary determinants of the annexation's merit." [8] *Id.* If the trial court found that these six primary determinants applied to the annexation, the annexation was to take place "notwithstanding the remonstrance and notwithstanding, further, the provision of any other statute of this state." *Id.* The statute continued: "If, however, the presence of these primary determinants cannot be demonstrated in the evidence, the annexation shall not take place." [9] *Id.* If

---

8. The six factors were listed as:
"(a) The annexation is in the best interests of the city and of the territory sought to be annexed.
(b) The area is urban in character, being an economic and social part of the annexing city.
(c) The terms and conditions set forth in the [annexation] ordinance are fair and just.
(d) The city is financially able to provide municipal services to the annexed area within the reasonably near future.
(e) The area sought to be annexed, if undeveloped, is needed for development of the city in the reasonably near future.

(f) The lines of the annexation are so drawn as to form a compact area abutting the municipality."

9. This would appear to have placed upon the City the burden to establish the existence of these primary determinants. However, the provision in Section 48–702 stating that the remonstrance or complaint filed by the persons appealing from the annexation must "state the reason why such annexation ought not in justice take place," would seem to have placed some burden upon the appellant-remonstrators. The statute in its present form, Indiana Code § 36–4–3–11 (Burns Code Ed. Supp.2005) contains similar language. Case

the remonstrance was successful in defeating the annexation, no further annexation proceedings could take place for two years thereafter. *Id.*

There are similarities between Section 48–702 and the statutory scheme at issue here. Both are "remonstrances" in the sense that they require those opposed to the annexation or bond issuance to initiate a process without which the annexation or bond issuance would go forth unabated. Both limit participation to those who own land or real property in the affected area. And if the annexation or bond issuance is defeated, both statutes place time limits on when such proposals can begin anew. Both also use the word "remonstrance" in describing the process described therein. Yet there are also significant differences between the two statutes.

Under Section 48–702, the landowners had to remonstrate or, to use the wording of the statute, "appeal" the proposed annexation to a trial court. If a sufficient number of landowners did so, the trial court was to hear evidence on the listed "primary determinants," and if such were found, the annexation had to take place, but if such were not found, the annexation would fail. Thus, the remonstrators made their anti-annexation case to a trial court, which made the decision to allow the annexation or not based upon the evidence produced. In stark contrast, with respect to a bond issue, as opposed to an annexation, Section 3.2, does not provide that a trial court determine the bond issue. Instead, Section 3.2 sets up a competition between opponents and supporters of the bond issuance, with the side which collects the most signatures (from property owners) prevailing. Thus, Jones claims that Section 3.2 calls for what is effectively an "election" and not a "remonstrance" such as was at issue in *Forks*.

The definitions of "election" mentioned in *Forks* included one from American Jurisprudence and one from the Indiana Code. The former defined election broadly as an "expression of a choice by the voters of a body politic, or as the means by which a choice is made by the electors." 257 Ind. at 241, 273 N.E.2d at 859. The more restrictive definition from American Jurisprudence was "a choosing or selection, by those having a right to participate, of persons to fill public office or of public measures which shall be adopted or rejected." [10] *Id.*

Black's Law Dictionary 1164 (5th Ed.1979) defines "remonstrance" as:

"Expostulation; showing of reasons against something proposed; a representation made to a court or legislative body wherein certain persons unite in urging that a contemplated measure be not adopted or passed. A formal protest against the policy or conduct of the government or of certain officials drawn up and presented by aggrieved citizens."

The statute at issue in *Forks* would seem to fit within this definition, as it was a representation made to a court urging it not to allow an annexation. Section 3.2,

---

law has now established that under the "appeal" process, the effect "is to abate the culmination of the annexation pending review in the courts, where the burden is on the municipality to sustain the annexation by showing that it has complied with the requirements of the statute." *City of Hobart v. Chidester,* 596 N.E.2d 1374, 1376–77 (Ind.1992).

**10.** The Indiana Code definition mentioned in *Forks* has since been repealed, but Indiana

Code § 3–5–1–1 (Burns Code Ed. Repl.2002) is similarly worded in stating that Title 3 of the Code ("Elections") applies to "each election at which the electorate of the state or political subdivision ... (1) nominates or chooses by ballot public officials; or ... (2) decides a public question lawfully submitted to the electorate." But it would be difficult to consider this a definition of "election," in that this section itself refers to "each election." This presents a problem of circular logic.

however, does not provide for any representation to be made to a court or legislative body. Instead, it calls for a signature-collection competition between proponents and opponents of the bond issuance, with the side collecting the most signatures prevailing. However, Section 3.2 clearly does not call for a traditional election or referendum procedure by ballot.

The relevant definition of "referendum" in Black's Law Dictionary 1152 (5th Ed.1979) is "[r]eservation by people of state, or local subdivision thereof, of right to have submitted for their approval or rejection, under prescribed conditions, any law or part of law passed by lawmaking body." If viewed liberally, this could include the process set forth in Section 3.2. Again, however, Section 3.2 does not provide for a traditional referendum at the ballot. It is, however, more akin to a referendum (or election) than the remonstrance process at issue in *Forks,* where the court described a remonstrance as having the purpose of "afford[ing] the opportunity to any person seeking to object to the proposed action of a body politic by taking the affirmative step to register their objection." 257 Ind. at 242, 273 N.E.2d at 859. Such a definition would seem to include the action taken by those who opposed the annexation in *Forks,* whereas Section 3.2 calls for a signature-collection competition between the proponents and opponents.

Given the significant differences between the remonstrance at issue in *Forks* and the petition/remonstrance process set forth in Section 3.2, *Forks* does not control the outcome of the present case. The petition/remonstrance process set forth in Section 3.2 is a *de facto* election or referendum. We see no reason why the State, which could not constitutionally restrict the franchise to owners of real property in a traditional election or referendum by ballot regarding school bonding issues, should be able to accomplish effectively the same thing by providing for a petition/remonstrance signature-collecting competition. The State may not accomplish indirectly what it may not do directly. Because we conclude that Section 3.2 calls for what amounts to a de facto election, the State may not limit the right to participate to only those who own real property within the political subdivision without the showing of a compelling state interest. Such showing has not been made here.

We recognize that this case is moot, and nothing we do now can change the fact that Jones was denied the right to participate in the petition/remonstrance process. Too, we are not inclined to overstep our judicial role and attempt to re-draft Section 3.2 to remedy the constitutional infirmities we perceive. Instead, we opt to stay the effectiveness of our holding until such time as the General Assembly adjourns from its next regularly-scheduled session. This provides the General Assembly with the opportunity to redraft or otherwise remedy the inadequacies of the current Section 3.2, if it so chooses. However, if the General Assembly does not act upon this issue by the time it adjourns, our holding will then be in effect, and the propriety of every petition/remonstrance procedure planned or then underway will be subject to the holdings of this case.

The trial court was in error to grant summary judgment in favor of Womacks in that Section 3.2 as currently drafted is unconstitutional.

KIRSCH, C.J., and DARDEN, J., concur.