310 Ga. 266
FINAL COPY

S21A0030. RHODEN et al. v. ATHENS-CLARKE COUNTY
BOARD OF ELECTIONS et al.

BETHEL, Justice.

Jerry NeSmith earned the support of a sufficient number of his community members to be elected as their district's commissioner for the Athens-Clarke County Unified Government. Sadly, NeSmith died just three days before Election Day. In addition to the personal loss of his family and friends, NeSmith's death before Election Day ultimately resulted in an electoral loss for his supporters, a number of whom joined to bring suit in superior court challenging the results of the election.

Because the applicable Georgia statutes dictate that votes cast on paper ballots for a candidate who has died before Election Day are void, none of the votes cast for NeSmith had legal effect. Accordingly, for reasons more fully explained below, we determine that the Athens-Clarke County Board of Elections properly applied

OCGA §§ 21-2-437 (d) and 21-2-438 (a) when it voided the votes cast for NeSmith and declared Jesse Houle the commissioner-elect for Athens-Clarke County Commission District 6. Moreover, we also hold that the Board's application of those statutes in this case did not violate any rights of the appellants under the First or Fourteenth Amendment to the United States Constitution or the Equal Protection Clause of the Georgia Constitution. Accordingly, we affirm the order of the superior court dismissing the appellants' election challenge.

1. *Factual background and procedural history.*

Jerry NeSmith and Jesse Houle qualified as candidates for the non-partisan election for Athens-Clarke County Commission District 6, which was held on June 9, 2020. NeSmith died on the evening of June 6. The election proceeded, and 3,271 ballots were cast in the race for the District 6 seat. Of those ballots, 1,866 were marked for NeSmith, and 1,405 were marked for Houle. The Athens-Clarke County Board of Elections ruled that, pursuant to OCGA §§ 21-2-437 (d) and 21-2-438 (a) and this Court's decision in *Jones v.*

*Norris*, 262 Ga. 468 (421 SE2d 706) (1992), all votes cast for NeSmith were void because he was deceased. On June 19, 2020, the Board certified the results of the election and declared Houle the winner of the District 6 election.

The appellants — Gordon Rhoden, Farol NeSmith, Rock Dunn, Jim Scanlon, and Judith Scanlon — are all registered voters who reside in District 6. On June 23, 2020, they filed a petition pursuant to OCGA § 21-2-521 et seq., challenging the results of the election on several grounds. The Board and Houle answered on July 10, 2020, and the superior court held a hearing on July 23, 2020.

At that hearing, the appellants called Charlotte Sosebee, the Director of Elections for Athens-Clarke County, to testify. On direct examination, she testified that ballots cast in person were cast "electronically" utilizing a "ballot marking device" and that provisional and absentee ballots were cast through the use of paper ballots.

On cross-examination, Director Sosebee elaborated that, under the voting system in place for the June 9 election, when a voter came

3

to a polling location to vote in person, the voter was issued an electronic access card that was programmed with the offices and candidates for which that voter was qualified to vote based on the voter's address. After receiving the ballot access card, the voter inserted the card into an electronic ballot marking device. The device's screen then displayed the information from the access card showing the offices and candidates for which the voter was eligible to cast a vote. The voter then made selections for any or all of the displayed elections through use of the electronic ballot marking device and was then able to view all selections on a final summary screen. Once the voter's choices were confirmed on the screen, the voter's ballot was printed onto a paper form showing the selections made by the voter, and the voter had an additional opportunity to view and confirm or modify the selections for each office. The paper ballot was then inserted into an electronic tabulating device that scanned the paper ballot, counted the votes cast for each candidate, and recorded the votes in a central database. The paper ballot remained inside the device until collected by a poll manager who

then sealed the paper ballots. The paper ballots were then to remain sealed until opened by the Board of Elections if the need arose, such as the need to conduct a recount. Director Sosebee testified that, even though an electronic ballot marking device and an optical scanner were utilized in the election, the ballots cast in this process were "paper ballots."

On July 27, 2020, the superior court entered an order denying the appellants' requested relief and dismissing their petition. In that order, the superior court found that the election had been conducted with paper ballots with the assistance of an optical scanning voting system and electronic ballot marking devices, noting that these were simply "alternate systems for marking or employing paper ballots." The superior court thus determined that, under *Jones*, OCGA §§ 21-2-437 (d) and 21-2-438 (a) applied to this election and that the Board was correct in its assessment that the votes cast for NeSmith were void due to his death. The superior court also rejected a number of constitutional arguments raised by the appellants, including that their rights to vote, to have their votes counted, to equal protection,

5

and to freedom of association had been violated by the Board's decision. The superior court also rejected the appellants' argument that the Board's decision was arbitrary and capricious in violation of their rights to due process.

The following day, the appellants filed a notice of appeal directed to this Court. The parties submitted briefs on an expedited basis, as ordered by this Court. We now consider, in turn, each of the claims raised by the appellants.

2. *Application of OCGA §§ 21-2-437 (d) and 21-2-438 (a) to votes cast for NeSmith.*

Ordinarily, the candidate who receives the most votes in an election wins or at least advances to a runoff against the person receiving the second highest number of votes. See OCGA § 21-2-501

6

(a) (1).[1] However, the relevant portions of OCGA §§ 21-2-437 (d)[2] and

---

[1] That Code section provides, in relevant part:

Except as otherwise provided in this Code section, no candidate shall be nominated for public office in any primary or special primary or elected to public office in any election or special election unless such candidate shall have received a majority of the votes cast to fill such nomination or public office. In instances where no candidate receives a majority of the votes cast, a run-off primary, special primary runoff, run-off election, or special election runoff between the candidates receiving the two highest numbers of votes shall be held. . . .

[2] OCGA § 21-2-437 (d) provides:

Any ballot marked so as to identify the voter shall be void and not counted, except a ballot cast by a challenged elector whose name appears on the electors list; such challenged vote shall be counted as prima facie valid but may be voided in the event of an election contest. Any ballot marked by anything but pen or pencil shall be void and not counted. Any erasure, mutilation, or defect in the vote for any candidate shall render void the vote for such candidate but shall not invalidate the votes cast on the remainder of the ballot, if otherwise properly marked. If an elector shall mark his or her ballot for more persons for any nomination or office than there are candidates to be voted for such nomination or office, or if, for any reason, it may be impossible to determine his or her choice for any nomination or office, his or her ballot shall not be counted for such nomination or office; but the ballot shall be counted for all nominations or offices for which it is properly marked. Unmarked ballots or ballots improperly or defectively marked so that the whole ballot is void shall be set aside and shall be preserved with other ballots. In primaries, votes cast for candidates who have died, withdrawn, or been disqualified shall be void and shall not be counted. In elections, votes for candidates who have died or been disqualified shall be void and shall not be counted.

21-2-438 (a)[3] provide that "[i]n elections, votes for candidates who have died or been disqualified shall be void and shall not be counted." The Board of Elections applied this straightforward rule in this case to void all of the ballots marked for NeSmith who, due to his death, was no longer eligible to serve in the office for which this election was held. Thus, even though more ballots were marked for NeSmith than for Houle, all votes cast for NeSmith were void.

[3] OCGA § 21-2-438 (a) provides:

Any ballot marked so as to identify the voter shall be void and not counted, except a ballot cast by a challenged elector whose name appears on the electors list; such challenged vote shall be counted as prima facie valid but may be voided in the event of an election contest. Any ballot marked by anything but pen or pencil shall be void and not counted. Any erasure, mutilation, or defect in the vote for any candidate shall render void the vote for such candidate but shall not invalidate the votes cast on the remainder of the ballot, if otherwise properly marked. If an elector shall mark his or her ballot for more persons for any nomination or office than there are candidates to be voted for such nomination or office, or if, for any reason, it may be impossible to determine his or her choice for any nomination or office, his or her ballot shall not be counted for such nomination or office; but the ballot shall be counted for all nominations or offices for which it is properly marked. Ballots not marked or improperly or defectively marked so that the whole ballot is void, shall be set aside and shall be preserved with the other ballots. In primaries, votes cast for candidates who have died, withdrawn, or been disqualified shall be void and shall not be counted. In elections, votes for candidates who have died or been disqualified shall be void and shall not be counted.

8

Houle was then declared the winner of the election because all valid votes cast in the District 6 election were cast for him.

The appellants argue that the rule embodied in OCGA §§ 21-2-437 (d) and 21-2-438 (a) applies only in elections conducted with paper ballots and that, because the Board utilized electronic ballot markers and an optical scanning voting system to administer the election for District 6, that election was not conducted with paper ballots. They further argue that, for elections conducted with electronic ballot markers and an optical scanning voting system, the Election Code is silent as to how election boards should treat votes cast for a candidate who has died. They argue that the superior court erred by not overturning the decision of the Board and applying the common law to order that a new election for District 6 be held, citing *Thompson v. Stone*, 205 Ga. 243, 247 (2) (53 SE2d 458) (1949) ("Unless the votes for an ineligible person are expressly declared [by statute] to be void, the effect of such person receiving a majority of the votes cast is . . . that a new election must be held, and is not to give the office to the qualified person having the next highest

number of votes." (citation and punctuation omitted)). We disagree.

Here, Director Sosebee testified that voters utilized electronic ballot marking devices to make their selections for each office. Upon confirmation of the voter's selections on the marking device, the voter's ballot was then printed onto a paper form which, after the voter had another opportunity to confirm or modify his or her selections, was fed into an electronic tabulating device that optically scanned the paper, counted the votes cast for each office, and recorded the votes in a central database. Director Sosebee testified that, even though an electronic marking device and an optical scanner were utilized in the election, all of the ballots cast through this process were "paper ballots."

The superior court's conclusion that the election was conducted with paper ballots was therefore supported by the evidence before it. Although various technologies were used to mark and count ballots in this election, each of the technologies implemented by the Board simply assisted voters in making their selections on paper and aided the Board in receiving, organizing, and tracking votes cast by paper

10

ballot in a clear and uniform manner.

Our decision in *Jones* contemplates that multiple technologies for marking and counting paper ballots can be used in a given election and that the election should still be deemed to have been conducted via paper ballots. See 262 Ga. at 468. In *Jones*, this Court held that there was no distinction between a paper ballot marked by a pencil and a cardboard ballot marked by a punch. See id. at 469. We thus determined that OCGA § 21-2-438 (a), which we noted "govern[s] the conduct of elections using paper ballots," applied to void ballots cast for a candidate who had withdrawn from the election. Id.

The appellants make much of the fact that we acknowledged in *Jones* that there were no statutes governing the use of the "vote recorder" ballots that had been used in the election at issue in that case. They further note that Georgia's Election Code now contains a number of provisions governing the use of electronic ballot markers and optical scanning voting equipment, none of which say anything about how an election board is to handle votes cast for a candidate

11

who died.

But it is clear from the record and our review of the relevant statutes that this election was conducted with paper ballots. As the trial court rightly noted, optical scanning voting systems and electronic ballot markers are technologies that assist election boards in conducting elections via paper ballots. In that regard, they are simply an adjunct to an election conducted with paper ballots —not a substitute for paper ballots.[4] Accordingly, under *Jones*, the provisions governing the use of paper ballots, including OCGA §§ 21-

---

[4] OCGA § 21-2-2 (19.1) defines "optical scanning voting system" as "a system employing paper ballots on which electors cast votes with a ballot marking device or electronic ballot marker after which votes are counted by ballot scanners." OCGA § 21-2-2 (2) defines a "ballot marking device" as a "pen, pencil, or similar writing tool, or an electronic device designed for use in marking paper ballots in a manner that is detected as a vote so cast and then counted by ballot scanners." An "electronic ballot marker" is "an electronic device that does not compute or retain votes; may integrate components such as a ballot scanner, printer, touch screen monitor, audio output, and a navigational keypad; and uses electronic technology to independently and privately mark a paper ballot at the direction of an elector, interpret ballot selections, communicate such interpretation for elector verification, and print an elector verifiable paper ballot." OCGA § 21-2-2 (7.1). A "ballot scanner" is "an electronic recording device which receives an elector's ballot and tabulates the votes on the ballot by its own devices[.]" OCGA § 21-2-2 (2.1). These and other statutory provisions governing the use of these technologies thus clearly contemplate that an optical scanning voting system, including one that utilizes electronic ballot markers, is used with paper ballots.

2-437 (d) and 21-2-438 (a), applied to this election. Under those provisions, the Board of Elections discharged its statutory duty to void all ballots cast for NeSmith, leaving Houle the winner.

3. *Claims under the United States Constitution.*

The appellants assert that the Board's application of OCGA §§ 21-2-437 (d) and 21-2-438 (a) to void the votes cast for NeSmith violated a number of their rights under the United States Constitution. They argue that the Board's application of the statutes violates their rights to vote, as recognized under the First and Fourteenth Amendments, and their rights under the Equal Protection and Due Process Clauses of the Fourteenth Amendment. We address each claim in turn.

(a) The appellants challenge the Board's application of OCGA §§ 21-2-437 (d) and 21-2-438 (a) on the basis that an election rule voiding ballots marked for a candidate who has died prior to the election places a severe burden on the right to vote under the First and Fourteenth Amendments. We evaluate the constitutionality of the Board's application of these statutes by applying the *Anderson-*

13

*Burdick* test. See *Anderson v. Celebrezze*, 460 U. S. 780 (103 SCt 1564, 75 LE2d 547) (1983); *Burdick v. Takushi*, 504 U. S. 428 (112 SCt 2059, 119 LE2d 245) (1992). In considering whether the application of a voting regulation violates the First and Fourteenth Amendments, a reviewing court

> must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

*Anderson*, 460 U. S. at 789 (I); see also *Burdick*, 504 U. S. at 434 (II).

Under this framework, a law that severely burdens the right to vote must be narrowly drawn to serve a compelling state interest. See *Burdick*, 504 U. S. at 434 (II). And even when a law imposes only a slight burden on the right to vote, relevant and legitimate interests of sufficient weight still must justify that burden. See

14

*Common Cause/Ga. v. Billups*, 554 F3d 1340, 1352 (III) (B) (11th Cir. 2009). The more a challenged law burdens the right to vote, the stricter the scrutiny to which reviewing courts subject that law. See *Stein v. Ala. Sec. of State*, 774 F3d 689, 694 (IV) (11th Cir. 2014).

(i) *Burden on right to vote.*

The appellants argue that the Board's application of OCGA §§ 21-2-437 (d) and 21-2-438 (a) places a severe burden on their voting rights and that the Board's action was not narrowly drawn to advance a state interest of compelling importance. We reject these contentions.

As the Supreme Court recognized in *Anderson,* while voters' rights under the First and Fourteenth Amendments are fundamental,

> not all restrictions imposed by the States on candidates' eligibility for the ballot impose constitutionally suspect burdens on voters' rights to associate or to choose among candidates. . . . [A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.

(Citation and punctuation omitted.) *Anderson,* 460 U. S. at 788 (I).

15

Noting that virtually any regulation of the electoral process will have some impact on an individual's right to vote, the Supreme Court noted that "the [s]tate's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions." Id. In those circumstances, courts should uphold "reasonable, politically neutral regulations." (Citation and punctuation omitted.) *Washington State Grange v. Washington State Republican Party*, 552 U. S. 442, 452 (II) (A) (128 SCt 1184, 170 LE2d 151) (2008). Under this framework, "States have a major role to play in structuring and monitoring the election process," *California Democratic Party v. Jones*, 530 U. S. 567, 572 (II) (120 SCt 2402, 147 LE2d 502) (2000), and states are afforded "significant flexibility in implementing their own voting systems." *Doe v. Reed*, 561 U. S. 186, 195 (III) (A) (130 SCt 2811, 177 LE2d 493) (2010).

In *Burdick*, the Supreme Court considered a challenge to a Hawaii election law that made no provision for write-in voting. See 504 U. S. at 430 (I). A voter challenged this law, arguing that he had been prevented from voting for a person who had not filed

nominating papers and that, in future elections, he might wish to vote for persons who did not appear on the ballot. See id. The Supreme Court rejected this challenge, noting the petitioner's "erroneous assumption that a law that imposes any burden upon the right to vote must be subject to strict scrutiny." Id. at 432 (II). The Court recognized that States retain the power to regulate their own elections, see *Sugarman v. Dougall*, 413 U. S. 634, 647 (IV) (93 SCt 2842, 37 LE2d 853) (1973); *Tashjian v. Republican Party of Connecticut*, 479 U. S. 208, 217 (II) (107 SCt 544, 93 LE2d 514) (1986), and that "[e]lection laws will invariably impose some burden upon individual voters." *Burdick*, 504 U. S. at 433 (II). The Court went on to note that

> [e]ach provision of [an election] code, whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects — at least to some degree — the individual's right to vote and his right to associate with others for political ends. Consequently, to subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest . . . would tie the hands of States seeking to assure that elections are operated equitably and efficiently. Accordingly, the mere fact that a State's

17

system creates barriers tending to limit the field of candidates from which voters might choose does not of itself compel close scrutiny.

(Citations and punctuation omitted.) Id. On this basis, the Supreme Court upheld Hawaii's rule regarding write-in ballots. See id. at 441-442 (III).

Georgia's election laws at issue here, much like those at issue in *Burdick*, limit voters' opportunities to select the candidate of their choice. In *Burdick*, write-in votes for a candidate were not valid under Hawaii law. They could not be cast, could not be accepted by election authorities, and were not counted. See *Burdick*, 504 U. S. at 430. In short, they were void. The Supreme Court determined that rules implementing that system placed only minimal burdens on a voter's right to vote. The Georgia statutes before us have a similar effect.

Just as write-in ballots were void under the Hawaii law at issue in *Burdick*, any ballots marked in a Georgia election for a candidate who has died are void under OCGA §§ 21-2-437 (d) and 21-2-438 (a). Such votes do not count, and our laws treat them as though they

were never cast at all. To the extent this rule burdens an individual's right to vote, the burden may even be more limited than the statutes at issue in *Burdick* because, in this case, the fact of the candidate's death as well as the application of the statutes have deprived the voters of their opportunity to have that candidate serve in office. Moreover, each voter who voted for NeSmith had the opportunity to vote for an eligible candidate — in this case, Houle. Thus, to the extent there is a burden on the appellants' right to vote occasioned by the application of OCGA §§ 21-2-437 (d) and 21-2-438 (a) to void votes cast for a candidate who has died, any such burden is, at most "a very limited one." *Burdick*, 504 U. S. at 437 (II) (A).

(ii) *State's interest in voiding votes cast for NeSmith.*

We turn next to the state's interests as asserted by the Board and Houle to justify the policy of voiding votes cast for a candidate who has died. Because we have already concluded that the burden occasioned by this rule is slight, the Board need not establish a compelling interest to tip the constitutional scales in its direction. See *Burdick*, 504 U. S. at 439 (II) (B). Instead, it need only put forth

19

a reasonable, non-discriminatory justification for the rule. Such justification must be "sufficiently weighty to justify the limitation," even though the burden on the right to vote occasioned by this rule is slight. (Citation and punctuation omitted.) *Crawford v. Marion County Election Bd.*, 553 U. S. 181, 190 (128 SCt 1610, 170 LE2d 574) (2008).

Both Houle and the Board posit that OCGA §§ 21-2-437 (d) and 21-2-438 (a) simply allow for the efficient selection of elected representatives. Houle further asserts that Georgia has an interest in seeing that an election produces a winner so that voters are ensured that newly elected officials take office when their terms are set to begin. We agree that these are important regulatory interests and that the policy embodied by OCGA §§ 21-2-437 (d) and 21-2-438 (a) is a reasonable and non-discriminatory exercise of the state's power to regulate elections in furtherance of these goals. See *Burdick*, 504 U. S. at 433 (II) (noting state's interest in "seeking to assure that elections are operated equitably and efficiently"); *Anderson*, 460 U. S. at 788 (I). Further, these interests — which are

20

critical to the operation of elections — outweigh the minimal burden placed on the right to vote for a specific candidate who would not be able to serve in office.

The appellants' preferred remedy — ordering a new election for District 6 due to the death of the person for whom the most votes were cast — is one of several options that the General Assembly could have selected in determining how to resolve this unfortunate and, thankfully, rare scenario. But the General Assembly chose instead to declare that any ballots marked for a candidate who has died are void, just as ballots marked for a person who has been disqualified from the ballot are void under the same statutes. See OCGA §§ 21-2-437 (d); 21-2-438 (a). That policy did not target the appellants or other voters on the basis of any political affiliation or viewpoint, membership in a protected class, or other impermissible basis. The statutes operated against the appellants only because they voted for a person who died and who could not assume the office for which he had previously qualified to run. The same fate could unfortunately befall any candidate for elected office in Georgia, and

his or her supporters might find themselves in the same disappointed position the appellants find themselves here. But the application of a policy voiding votes cast for a dead candidate does not violate the right to vote under the First Amendment and the Fourteenth Amendment any more than it would violate the rights of an individual who wanted to vote for someone otherwise disqualified from appearing on the ballot or assuming office. See *Burdick*, 504 U. S. at 440 (II) (B) n.10 ("It seems to us that limiting the choice of candidates to those who have complied with state election law requirements is the prototypical example of a regulation that, while it affects the right to vote, is eminently reasonable."); *Cox v. Barber*, 275 Ga. 415, 417-418 (2) (568 SE2d 478) (2002) (per curiam) (upholding durational residency requirement for candidates for Public Service Commission under *Anderson-Burdick* test).

To the contrary, the broad application of this rule to any similar situation (without regard to the identity or affiliation of any candidate or voter) illustrates that OCGA §§ 21-2-437 (d) and 21-2-438 (a) provide a reasonable, neutral, and non-discriminatory

22

solution to a confounding electoral problem. See *Crawford*, 553 U. S. at 202-203 (IV) ("When we consider only the statute's broad application to all . . . voters, we conclude that it imposes only a limited burden on voters' rights." (citation and punctuation omitted)). Rather than requiring that election boards incur the expense of a new election — potentially delaying the ability of the ultimate winner to take office when his or her term would otherwise have begun — the state's policy simply discards any votes cast for a candidate who has died, just as it does for any candidate who has been disqualified. If that candidate receives the most votes, the next highest vote-getter either wins the election or moves to a runoff if he or she did not achieve a majority of valid votes cast. See OCGA § 21-2-501 (a) (1). In light of the minimal burden this rule places on the right to vote, the state's interest in finality and in administering a fair and efficient election justify this rule and the Board's application of it in this case. Thus, the Board's application of OCGA §§ 21-2-437 (d) and 21-2-438 (a) did not violate the appellants' rights to vote under the First and Fourteenth Amendments.

(b) The appellants also argue that the Board's decision to invalidate votes cast for NeSmith valued their votes less than votes cast for Houle and that this action constituted unconstitutional "later arbitrary and disparate treatment" as articulated in *Bush v. Gore*, 531 U. S. 98, 104-105 (II) (B) (121 SCt 525, 148 LE2d 388) (2000). But, as is well known, *Bush* addressed recount procedures that were ordered by the Florida Supreme Court after the disputed 2000 presidential election. The United States Supreme Court held that court-ordered procedures for conducting a manual recount of certain ballots cast in various counties in Florida were not specific enough such that they could be implemented in order to make a standards-based decision regarding the intent of the voter who had cast each disputed ballot. See id. at 105-111 (II) (B).

In contrast, OCGA §§ 21-2-437 (d) and 21-2-438 (a) provide for a simple, objective judgment to be made by the Board: if a candidate has died, any votes cast for him or her are void. The Board need not engage in the fraught determination as to how a "dimpled," "hanging," or "pregnant" chad on a paper ballot evinces the voter's

24

intent to select a particular candidate, as election boards in Florida were attempting to do in 2000. See *Favorito v. Handel*, 285 Ga. 795, 797 (1) (a) (684 SE2d 257) (2009).

Moreover, to the extent *Bush* took issue with the fact that the recount procedures at issue had been developed only after the election, see 531 U. S. at 104-105 (II) (B), that concern is not present here. OCGA §§ 21-2-437 (d) and 21-2-438 (a) were enacted well before the June 9, 2020 election for District 6 county commissioner. Upon learning of NeSmith's death, the Board was not attempting to fashion an ad hoc solution to a new problem not contemplated by state law. Instead, the Board applied clear and longstanding Georgia election statutes. Consequently, the appellants have no claim that votes cast for NeSmith were void as the result of "*later* arbitrary and disparate treatment," as nothing about the requirements of OCGA §§ 21-2-437 (d) and 21-2-438 (a) has been shown to lack "specific standards to ensure [their] equal application." (Emphasis supplied.) *Bush*, 531 U. S. at 104-106 (II) (B).

(c) Appellants also make a number of more generalized arguments that the application of OCGA §§ 21-2-437 (d) and 21-2-438 (a) violates their rights under the Fourteenth Amendment. But because the decisions cited by the appellants have no bearing on the issues before us in this case, we reject these claims.

Citing the United States Supreme Court's decisions in *Wesberry v. Sanders*, 376 U. S. 1, 17 (II) (84 SCt 526, 11 LE2d 481) (1964); *Gray v. Sanders*, 372 U. S. 368, 380 (III) (83 SCt 801, 9 LE2d 821) (1963); and *United States v. Mosley*, 238 U. S. 383, 386 (35 SCt 904, 59 LE 1355) (1915), the appellants argue that the Board's application of OCGA §§ 21-2-437 (d) and 21-2-438 (a) in this case violate what they characterize as their "fundamental right to have their votes counted." The appellants also argue that the Board's application of OCGA §§ 21-2-437 (d) and 21-2-438 (a) denied them an equal vote in the District 6 election and unfairly weighted the votes of those who voted for Houle, again citing *Gray* and the United States Supreme Court's decisions in *City of Phoenix v. Kolodziejski*, 399 U. S. 204, 209 (I) (90 SCt 1990, 26 LE2d 523) (1970), and *Hadley*

26

*v. Junior College Dist. of Metropolitan Kansas City*, 397 U. S. 50, 56 (90 SCt 791, 25 LE2d 45) (1970).

But none of those decisions concerned issues similar to those before us in this case. *Wesberry* dealt with malapportionment of congressional districts and the "one person, one vote" principle. See 376 U. S. at 7-8 (II) (declaring Georgia's 1931 apportionment of congressional districts to be unconstitutional and holding that Article I, Section II of the United States Constitution requires "as nearly as is practicable one man's vote in a congressional election . . . to be worth as much as another's"). *Hadley* likewise involved malapportionment of voting districts — specifically, districts for trustees of a junior college board. See 397 U. S. at 51. The Supreme Court held in that case that the formula for establishing the districts resulted in systematic discrimination against voters in more populous districts by diluting their voting power relative to the voting power of those residing in smaller districts in violation of the Equal Protection Clause. See id. at 52. Similarly, *Gray* declared unconstitutional Georgia's former county unit system, which

27

allocated to each county a specified number of members in the Georgia House of Representatives. See 372 U. S. at 381 (III). The Supreme Court declared that this system, which gave every qualified voter in the statewide election one vote, but which, among other outcomes, resulted in rural votes being weighted more heavily than urban votes, violated the Equal Protection and Due Process Clauses of the Fourteenth Amendment and the Seventeenth Amendment. See *Gray*, 372 U. S. at 370-371 (I), 377-381 (III). Because the appellants have not alleged any type of dilution of their votes like that the Supreme Court ruled unconstitutional in these decisions, their claims under those decisions fail.

The appellants' reliance on *Mosley* is also misplaced. *Mosley* was a criminal case involving a conspiracy to omit election returns from certain voting precincts. In upholding the constitutionality of the criminal statute, the Supreme Court simply noted that "the right to have one's vote counted is as open to protection by Congress as the right to put a ballot in a box." *Mosley*, 238 U. S. at 386. But that case involved deliberate criminal efforts to ensure that certain

ballots that had been validly cast were not counted. That is not the case before us.

Likewise, the *Phoenix* case provides no relief to the appellants. That case involved a challenge to a state law providing that only owners of real property had the right to vote in an election to approve certain bonds to be issued by the city. See 399 U. S. at 212-213 (I). That law was challenged by a city resident who was otherwise qualified to vote in the election but who did not own real property in the city. See id. at 206-207. The Supreme Court held that the statute restricting voting to property owners violated the Equal Protection Clause of the Fourteenth Amendment. See id. at 213 (II). The appellants have not made any comparable allegation in this case.

In sum, while the cases cited by the appellants stand for important constitutional principles guaranteeing the right to vote on a fair and equitable basis, we see nothing in those decisions touching on the issues presented in this case. Although "[t]he right to vote is fundamental, forming the bedrock of our democracy[,] it is

29

also clear that states are entitled to broad leeway in enacting reasonable, even-handed legislation to ensure that elections are carried out in a fair and orderly manner." (Citations and punctuation omitted.) *Favorito*, 285 Ga. at 796 (1) (a). While courts have recognized the fundamental nature of the right to vote, including the right to vote in legislative districts roughly equal in size and to have an elector's vote counted on equal terms with those cast by other electors, the appellants have presented no cases to this Court demonstrating that state statutes that void votes cast for a candidate who has died violate these rights, as they have been articulated by the United States Supreme Court.

4. *Claim under the Georgia Constitution.*

In addition to their claims under the United States Constitution, the appellants argue that the Board's invalidation of their votes violates Georgia's Equal Protection Clause set forth in Article I, Section I, Paragraph II of the Georgia Constitution of 1983, which provides that "[n]o person shall be denied the equal protection of the laws." But as we have previously held, Georgia's Equal

30

Protection Clause "is generally coextensive with and substantially equivalent to" the Equal Protection Clause of the Fourteenth Amendment, and "we apply them as one." *Democratic Party of Ga. v. Perdue*, 288 Ga. 720, 728 (2) (707 SE2d 67) (2011). The appellants have made no argument for a different application of the Georgia constitutional provision under the circumstances of this case. Thus, just as the appellants' claims under the Equal Protection Clause of the Fourteenth Amendment fail, so too do their claims under the equal protection clause of the Georgia Constitution.

5. *Conclusion.*

In sum, the superior court did not err by determining that the appellants' challenge to the action of the Board of Elections was without merit. The Board properly applied OCGA §§ 21-2-437 (d) and 21-2-438 (a) to determine that all votes cast for NeSmith were void. The application of those statutes by the Board in this case violated no rights of the appellants recognized under the First or Fourteenth Amendment to the United States Constitution or Article I, Section I, Paragraph II of the Georgia Constitution. We thus

31

affirm the judgment of the superior court.

*Judgment affirmed. All the Justices concur, except Warren, J., not participating.*


Decided October 19, 2020.

Election contest. Clarke Superior Court. Before Judge Hodges, Senior Judge.

*David F. Ellison*, for appellants

*Carothers & Mitchell, Thomas M. Mitchell; David W. Griffeth*, for appellees.